No. 13296

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

THE STATE OF MONTANA,

     Plaintiff and Respondent,

-vs-

DEWEY EUGENE COLEMAN,

     Defendant and Appellant.

---

Appeal from:  District Court of the Sixteenth Judicial District,
          Honorable A. B. Martin, Judge presiding.

Counsel of Record:

    For Appellant:

        Moses, Tolliver and Wright, Billings, Montana
        Charles F. Moses argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        John Forsythe argued, County Attorney, Forsyth, Montana
        Lee Overfelt, Billings, Montana

---

               Submitted:  March 1, 1978

               Decided: APR 26 1978

Filed:  APR 26 1978

*Thomas J. Kearney*, Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant appeals from the final judgment of the District Court, Rosebud County, following a jury trial. Defendant was convicted of deliberate homicide, aggravated kidnapping, and sexual intercourse without consent, inflicting bodily injury.

On July 4, 1974, Peggy Lee Harstad, 21 years of age, disappeared while driving alone from Harlowton to Rosebud, Montana. She was last seen alive around 9:00 p.m. that night at Melstone, Montana. On July 5, 1974, her car was found within a few miles of her home, near Rosebud. On July 7, 1974, a ranch hand discovered a purse and other articles belonging to Peggy Lee Harstad inside a culvert approximately ten miles west of her abandoned car.

In the developing investigation, an elderly couple informed the sheriff of Rosebud County that they had seen a black man and a white man hitchhiking on July 4 between Roundup and Forsyth, Montana at about the time of day Peggy Lee Harstad was driving between those towns. Subsequently, these two men were identified as the defendant, Dewey Eugene Coleman, a black man, and Robert Dennis Nank, a white man.

On July 9, 1974, representatives of the Rosebud County sheriff's office went to the Veteran's Administration Hospital in Sheridan, Wyoming, where these men were, to question them. Defendant and Nank admitted being in the area of Peggy Lee Harstad's disappearance and hitchhiking through Forsyth on the night of July 4th.

On August 6, 1974, the F.B.I. laboratory provided a positive comparison between a fingerprint lift taken from the exterior of the Harstad vehicle and a sample fingerprint

of Nank. The F.B.I. also reported a positive comparison between a fingerprint of defendant and a lift taken from a paper found in Harstad's purse. In an interview with F.B.I. agents on August 1, 1974, defendant and Nank admitted seeing the Harstad vehicle abandoned on the road. When he was asked about his fingerprint in the purse, defendant stated that he found a purse along the road they were hitchhiking.

Vacuumings were taken in the Harstad vehicle. These were sent to the F.B.I. laboratory for analysis. They reported, on September 13, 1974, that Negroid head hairs were found in the loose hairs taken from the front seat. In addition, two Negroid pubic hairs were found in the vacuumings.

On August 29, 1974, the decomposed body of Peggy Lee Harstad was found on the north bank of the Yellowstone River, just west of Forsyth, Montana. A forensic patholo- gist, Dr. John Pfaff, identified the remains as Peggy Lee Harstad by the use of dental charts. Because of the state of decomposition of her remains, Dr. Pfaff could not deter- mine a cause of death.

Since their original questioning in Sheridan, Wyoming, the defendant and Nank had moved to Boise, Idaho, sometime in August. At the request of Rosebud County authorities, the Boise police had kept these men under surveillance.

On October 16, 1974, the then Rosebud County attorney, William Meisburger, and Undersheriff Graham Makin went to Boise, Idaho to further interrogate defendant and Nank. The next day, October 17, 1974, Meisburger and Makin went to see the Boise police. They talked to Detective Brake of the Boise police about bringing the defendant and Nank to the police station for questioning. They informed him of all the evidence they had connecting the defendant and Nank with

the death of Peggy Lee Harstad. Detective Brake, since he had been doing some of the surveillance of the two men, knew about most of the evidence except about her body being found. After discussing the case with Meisburger and Makin, Detective Brake and a Detective Crowell went to the apartment where these two men were living. There the defendant and Nank were placed under arrest without a warrant for deliberate homicide in the death of Peggy Lee Harstad.

After their arrest and being placed in custody, arrest warrants and complaints were issued by a justice of the peace for Rosebud County. The warrants and complaint charged defendant and Nank with deliberate homicide.

Upon their arrest, defendant and Nank were advised of their rights. The defendant refused to waive his rights. Nank did waive his rights and, after being in custody for a few hours, gave a full confession. In his confession, he implicated himself and the defendant. He confessed that they kidnapped, raped, and murdered Peggy Lee Harstad. Nank consented to a search of their apartment and car for the murder weapons he said were used in the crime--namely, their motorcycle helmets and a rope. A search warrant was obtained and the helmets and rope recovered.

On October 24, 1974, a motion for leave to file an Information in the District Court, Rosebud County, was requested and granted. The Information charged the defendant with three counts: Count I, deliberate homicide; Count II, aggravated kidnapping; and Count III, sexual intercourse without consent, inflicting bodily injury. Defendant plead not guilty to all counts.

On January 30, 1975, defendant moved to suppress all confessions, statements and evidence, illegally seized. A

suppression hearing was held. Following the disqualification of the trial judge by the State and the assignment of the case to another judge, a second suppression hearing was held and defendant's motion denied.

On May 7, 1975, the State entered into a written plea bargaining agreement with Robert Nank. Under the terms of the agreement, Nank agreed to plead guilty to deliberate homicide and solicitation to commit sexual intercourse without consent, and further agreed to testify at defendant's trial in return for the dismissal of the aggravated kidnapping charge.

On May 19, 1975, defendant's then court appointed counsel made an oral offer of a conditional plea of guilty in return for dismissal of the aggravated kidnapping charge. On May 23, 1975, a written offer of a conditional plea of guilty was presented to the court. In this offer, defendant insisted on maintaining his innocence. The State refused to accept a guilty plea with defendant maintaining his innocence.

Following a change of defendant's court appointed counsel, a change of venue from Rosebud County to Custer County and finally to Yellowstone County, and other pretrial proceedings and motions, defendant's trial commenced on October 23, 1975, in Yellowstone County.

At trial, Coleman and Nank related opposite statements of fact as to their involvement with Miss Harstad.

Nank testified that he and Coleman were traveling between Roundup and Forsyth on U. S. 12 on his motorcycle when they ran out of gas. They then tried to hitchhike. He said that one car stopped, but the elderly couple refused to give them a ride.

Nank stated that Miss Harstad stopped and gave them a

ride. He testified that while driving down the road, he reached over and turned the key on her car off and steered the car to a stop. He stated that he put the girl in the back seat, took her clothes off, and attempted to rape her, but failed, while Coleman drove the car.

Nank testified that Coleman then raped her while he held her foot, testifying that he had a foot fetish. Nank said that they then went down by the Yellowstone River. He carried the girl, now fully clothed, over his shoulder, while Coleman came from behind swinging his silver motorcycle helmet by the chin strap and crashed it against her skull. Nank said that Coleman then took a yellow nylon rope and attempted to strangle her and asked Nank to help, but he did not strangle her. Then they took her down to the river and dumped her into it. As she was not dead, Nank held her head under water while Coleman held her legs.

Nank then testified that they drove her car back toward Forsyth until it ran out of gas. They removed some things from the car and walked into Forsyth. Nank left Coleman in Forsyth, hitchhiked with gas to the motorcycle, and returned to pick up Coleman. They then went to the V. A. Hospital in Sheridan where they stayed until going to Boise.

Defendant Coleman, on the other hand, testified that after the motorcycle ran out of gas and they were refused a ride, Nank suggested that because Coleman was black and there were few blacks in that area, he should go get the gas alone. Coleman testified that while he was sitting off the highway smoking, Nank got a ride.

After several hours, Nank returned in a car and, according to Coleman, Nank was wet, upset and acting strange. Coleman said he was told to get their things off the motor-

cycle and get in the car. When they both were in the car, Nank advised Coleman that he had killed a girl. The car ran out of gas, and they started to walk. Nank gave Coleman a purse to carry and later told him to get rid of it. Coleman threw the purse into a culvert. They then had breakfast in Forsyth, and Nank left Coleman while he went to get the motorcycle. Coleman also testified that Nank threatened him if he ever disclosed any of these facts.

The trial ended on November 14, 1975. The jury returned guilty verdicts on all three counts. On November 21, 1975, the court sentenced defendant Coleman to 100 years on Count I (deliberate homicide); to death by hanging on Count II (aggravated kidnapping); and to 40 years on Count III (sexual intercourse without consent inflicting bodily injury). Defendant's motion for a new trial was denied. A stay of execution has been granted pending this appeal.

Defendant raises 41 specifications of error on appeal. We will discuss these alleged errors within the broader context of the issue to which they relate.

We will restate the issues in this manner:

1. Whether the death penalty, imposed as defendant's sentence for conviction on Count II is constitutional?

2. Whether defendant should have been sentenced for 40 years on his conviction under Count III?

3. Whether defendant's motion to suppress the evidence obtained after his arrest should have been granted?

4. Whether defendant's conditional offer to plead guilty should have been accepted?

5. Whether defendant's motion to dismiss the three counts of the Information should have been granted and whether the Information should have been amended after defendant's entry of a plea?

6. Whether defendant's second jury challenge should have been sustained?

7. Whether the scope of the defendant's cross-examination of the State's witnesses was improperly limited?

8. Whether Nank's competency as a witness should have been determined prior to his testimony?

9. Whether defendant's motion to dismiss, at the close of the State's case, for lack of corroboration of Nank's testimony should have been granted?

10. Whether some of the State's witnesses were allowed to testify improperly to the prejudice of defendant?

11. Whether the District Court properly instructed the jury?

12. Whether certain State's exhibits were admissible and whether defendant's exhibits were properly refused?

13. Whether defendant's motion for a new trial should have been granted?

Issue 1. Defendant argues that his death sentence cannot stand because it is unconstitutional. He raises two claims. The first is that two jurors were excused for cause by the District Court based on their views of capital punishment. Defendant argues that this is in violation of Witherspoon v. Illinois, (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L Ed 2d 776. His second claim is that Montana's death penalty statute, under which he was sentenced, is unconstitutional on its face.

The Witherspoon rule is that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding prospective jurors for cause simply because they voiced general objections to the death penalty. There is an exception to the rule. It provides that if a

prospective juror is irrevocably committed to voting against conviction because of the possibility of a death penalty, he may be properly excluded for cause and a sentence of death carried out. In this case, defendant argues that Witherspoon makes his death sentence invalid as two jurors were improperly excluded. We disagree.

We hold that the two prospective jurors in this case were properly excluded under the exception to the general rule of Witherspoon. One juror stated that no matter how strong the evidence of guilt was, he could not vote to convict if a death penalty could be imposed. The other juror stated that she felt she could not live with herself if she was on a jury that convicted a person and that person received a death sentence as a result. Thus, both of these jurors were irrevocably committed to voting against a conviction because defendant could receive the death penalty. Their being excused for cause because of their irrevocable commitment against the death penalty does not invalidate defendant's death sentence.

At the time of defendant's trial, the death penalty statute in Montana for aggravated kidnapping was section 94-5-304, R.C.M. 1947. It read:

> "A court shall impose the sentence of death
> following conviction of aggravated kidnapping
> if it finds that the victim is dead as the
> result of the criminal conduct."

Defendant was sentenced to death under this statute.

This statute was repealed by the 1977 session of the state legislature. Section 16, Chapter 338, Laws of Montana 1977. The new death penalty statutes are codified as sections 95-2206.6 to 95-2206.15, R.C.M. 1947. The constitutionality of Montana's present death penalty statutes are not involved in this case.

-9-

Section 94-5-304, R.C.M. 1947, as it existed in 1975, is a mandatory death penalty statute. In the light of recent U. S. Supreme Court decisions, this statute is unconstitutional on its face, and defendant's death sentence thereunder cannot stand.

In 1976, the United States Supreme Court, for the first time, ruled on the constitutionality of mandatory death penalty statutes. Woodson v. North Carolina, (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L ed 2d 944. The statute before the Court was North Carolina's death penalty statute. It provided the death sentence for all persons convicted of first-degree murder. In holding this statute unconstitutional, the Supreme Court said:

> "* * * North Carolina's mandatory death
> penalty statute for first-degree murder
> departs markedly from contemporary standards
> respecting the imposition of the punishment
> of death and thus cannot be applied con-
> sistently with the Eighth and Fourteenth
> Amendments' requirement that the State's
> power to punish 'be exercised within the
> limits of civilized standards.'" Woodson
> v. North Carolina, 428 U.S. at 301, quoting
> from Trop v. Dulles, (1958), 356 U.S. 86,
> 78 S.Ct. 590, 2 L ed 2d 630.

In two later cases, the United States Supreme Court also held mandatory death penalty statutes unconstitutional. Coker v. Georgia, (1977), ____ U.S. ____, 97 S.Ct. 2861, 53 L ed 2d 982; Harry Roberts v. Louisiana, (1977), ____ U.S. ____, 97 S.Ct. 1993, 52 L ed 2d 637. In Coker the Court held unconstitutional a Georgia statute requiring the imposition of the death sentence for rape, when one or more speci- fied aggravating circumstances were found to be present. In Harry Roberts the Court held unconstitutional a Louisiana statute requiring the imposition of a death sentence for killing a peace officer. Concerning the Louisiana statute, the Court said:

"* * * it is essential that the capital
sentencing decision allow for consideration
of whatever mitigating circumstances may be
relevant to either the particular offender
or the particular offense. Because the
Louisiana statute does not allow consideration
of particularized mitigating factors, it is
unconstitutional." Harry Roberts v. Louisiana,
97 U.S. at 1996.

The same problems that existed in the statutes declared
unconstitutional in Woodson, Coker, and Harry Roberts are
present in the statute under which defendant was sentenced
in 1975. It is a mandatory death penalty statute. Under
this statute, if the court finds, as it did in this case,
that the victim of an aggravated kidnapping died as a
result of the crime, the convicted defendant must be sentenced
to die. There is no provision for the trial court to consider
any mitigating circumstances. It only allows the court to
determine the aggravating circumstance of death. This is not
constitutionally permissible.

To have a constitutionally valid death penalty, the
United States Supreme Court has established certain neces-
sary procedures. See: Gregg v. Georgia, (1976), 428 U.S.
153, 96 S.Ct. 2909, 49 L ed 2d 859; Proffitt v. Florida,
(1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L ed 2d 913; Jurek
v. Texas, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L ed 2d
929. None of those required procedures are present in
Montana's death penalty statute as it existed in 1974, nor
were they provided otherwise in this case. Thus, defendant's
death sentence cannot stand.

Issue 2. Defendant was sentenced to 40 years for Count
III, sexual intercourse without consent, inflicting bodily
injury. This sentence was imposed pursuant to section 94-5-
503(3), R.C.M. 1947, which provides:

"If the victim is less than 16 years old and
the offender is 3 or more years older than
the victim or if the offender inflicts bodily
injury upon anyone in the course of committing
sexual intercourse without consent, he shall
be imprisoned in the state prison for any term
of not less than 2 years or more than 40 years,
except as provided in 95-2206.18."

Defendant argues that there was insufficient evidence to support the verdict that the defendant inflicted bodily injury upon Peggy Lee Harstad in the course of committing sexual intercourse without consent. Since that is so, defendant argues that his 40 year sentence is erroneous. We agree.

The standard used to measure jury determinations is well settled in this state. State v. Pascgo, (1977), ____ Mont. ____, 566 P.2d 802, 34 St.Rep. 657. The rule is that questions of fact must be determined by the jury and given the required legal minimum of evidence, this Court on review will not substitute its judgment for that of the jury. State v. Merseal, (1974), 167 Mont. 409, 538 P.2d 1364. The evidence is examined to determine if there is substantial evidence to support the conviction when viewed in the light most favorable to the state. State v. Pascgo, supra; State v. Merseal, supra; State v. Farnes, (1976), ____ Mont. ____, 558 P.2d 472, 33 St.Rep. 1270. Applying these standards here, we find insufficient evidence to support the verdict that the defendant inflicted bodily injury in the course of committing sexual intercourse.

The evidence shows that defendant did commit sexual intercourse without consent. Nank testified that the defendant did so. Negroid pubic hairs were found in the car. However, Nank did not testify that defendant inflicted bodily injury upon Peggy Lee Harstad while engaged in sexual intercourse. The pathologist, Dr. Pfaff, specifically

-12-

testified that he found no evidence of physical injury to Peggy Lee Harstad during his examination of the body.

The State argues that the evidence does show that Peggy Lee Harstad was killed following her rape. This, they say, fits the requirements of section 93-5-503(3), R.C.M. 1947, that bodily injury was inflicted in the course of the rape. We are unconvinced. To sustain a conviction for sexual intercourse without consent, inflicting bodily injury, there must be a showing of bodily injury as that term is defined in the criminal code, section 94-2-101(5), R.C.M. 1947. That section reads:

> "'Bodily injury' means physical pain, illness, or any impairment of physical condition and includes mental illness or impairment."

There is no evidence showing that the defendant inflicted any such injuries on Peggy Lee Harstad. Thus, the verdict of the jury that defendant inflicted bodily injury in the course of committing sexual intercourse without consent is not supported by any evidence and cannot stand. Defendant should properly have been sentenced under section 94-5-503(2), R.C.M. 1947, for committing sexual intercourse without consent.

Issue 3. Prior to trial, defendant moved to have suppressed the evidence seized in Idaho--the motorcycle helmets and the rope. He argues that his arrest without a warrant was unlawful because of a lack of probable cause to arrest. He contends that the State did not have probable cause to arrest him until after Nank's confession several hours after his arrest. He further claims that Nank's constitutional rights were violated because Nank's confession and consent to the search were involuntary. The District Court refused to suppress the evidence. Defendant

maintains this was reversible error and raises the same arguments on appeal that he did in the suppression hearing.

We find there was probable cause to arrest defendant without a warrant. The legality of an arrest is determined by the law of the jurisdiction where the arrest was effected. Miller v. United States, (1958), 357 U.S. 301, 78 S.Ct. 1190, 2 L ed 2d 1332. In this case, since the arrest took place in Idaho, Idaho law must be applied to determine the validity of the arrest. Detective Brake arrested defendant and Nank in Boise without a warrant for a deliberate homicide in Montana. Idaho's general arrest statute, section 19-603(3), I.C., provides in pertinent part:

> "A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:
>
> " * * *
>
> "3. When a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it."

An examination of Idaho law discloses no case determining whether a peace officer may arrest a person in Idaho for a crime committed elsewhere, without a warrant, by the authority given him in this statute.

Idaho, like Montana, has adopted the Uniform Criminal Extradition Act. There is a provision in that act for arrests without a warrant of fugitives from another state, which defendant and Nank are. This provision is section 19-4514, I.C., which reads as follows:

> "Arrest without a warrant.--The arrest of a person may be lawfully made also by an officer or a private citizen without a warrant upon reasonable information that the accused stands charged with a crime punishable by death or imprisonment for a term exceeding one (1) year in the courts of another state; but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the last section; and thereafter his answer shall be heard as if he had been arrested on a warrant."

-14-

The courts in Idaho have not had occasion to interpret this statute.

Other jurisdictions have held that this provision of the Uniform Criminal Extradition Act implies the necessity of some prior court action in the state where the crime was committed, but the act is not intended to repudiate the common law rule that an arrest may be made on probable cause to believe the arrested person had committed a crime in another state irrespective of lack of complaint or warrant in that state. Desjarlais v. State, (1976), 73 Wis.2d 480, 243 N.W.2d 453.

> "In some jurisdictions an officer has no authority to arrest without a warrant a fugitive from justice from another state, even on telegraphic or personal request of the officers of the demanding state. In other jurisdictions an arrest may be made by an officer without a warrant, at least under certain circumstances as where the fugitive has committed a felony * * * ." 35 C.J.S. Extradition, §12(b).

These are matters left wholly to the individual states. Burton v. New York Cent. R.R. Co., (1917), 245 U.S. 315, 38 S.Ct. 108, 62 L.Ed. 314. Thus, the inquiry must be whether or not Idaho recognizes the common law rule.

In our view Idaho law recognizes the common law rule that an arrest may be made without a warrant where the arresting officer has probable cause to believe the person arrested had committed a crime in another state. Defendant's arrest was legal in this case as Detective Brake had probable cause to believe defendant had committed a felony in Montana. Under Idaho law, probable cause exists where there is such a state of facts as would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion that such person has committed a crime. State v. Polson, (1959), 81 Ida. 147, 339 P.2d 510; State v. Loyd, (1967), 92 Ida. 20, 435 P.2d 797. Here, Detective Brake

knew Peggy Lee Harstad had disappeared on the night of July 4, 1974. He knew defendant and Nank had been seen together in the area of her disappearance on that night. He knew their fingerprints had been identified on her car and purse. He knew Negroid head hairs and pubic hairs were found in her car and that defendant was a Negro. This constituted probable cause to arrest them.

Next we must look to see if the search of the apartment and car, where the helmets and rope were recovered, was lawful. We note that this search was not the product of defendant's and Nank's arrest. It was based on Nank's consent to the search. Defendant questions whether Nank's consent was freely given. However, defendant cannot assert any violations of Nank's constitutional rights.

The rule in Montana is that a defendant does not have standing to challenge violations of constitutional rights of a co-defendant or third party by law enforcement authorities. State v. Braden, (1973), 163 Mont. 124, 515 P.2d 692. This rule is based on Alderman v. United States, (1969), 394 U.S. 165, 89 S.Ct. 961, 22 L ed 2d 176. Therefore, we hold defendant cannot claim any violation of Nank's Fourth Amendment rights and his consent to the search made it a lawful search.

There was no error in the District Court's denial of defendant's motion to suppress.

Issue 4. Defendant claims the State refused to plea bargain with him or to accept his conditional plea of guilty because he is a black man. He claims it was because of his race that the State insisted upon having a full trial in this case, where, upon conviction, a death sentence could be imposed. He argues it is reversible error for the State

not to plea bargain or to accept his offer to plead guilty. How this would be so, defendant has not made clear to us.

We recognize that a defendant may plead guilty while maintaining his innocence, especially to avoid a death sentence. Brady v. United States, (1970), 397 U.S. 742, 90 S.Ct. 1463, 25 L ed 2d 747; North Carolina v. Alford, (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L ed 2d 162. However, these cases deal with attempts to withdraw a guilty plea after it has been entered and deal with the voluntariness of the original plea of guilty. These cases do not require the trial court or the prosecution to accept a guilty plea. The acceptance of a guilty plea to a charged offense is within the discretion of the trial court.

Accordingly, we find no error in the State's refusal to plea bargain with defendant or in the District Court's refusal to accept his conditional plea of guilty while maintaining his innocence.

Issue 5. Defendant contends the District Court erred in denying his motion to dismiss the Information for failure to state facts sufficient to constitute an offense. His argument is that section 95-1503, R.C.M. 1947, relating to the form of a charge, requires that the charge to be in ordinary and concise language, and in such a manner that the defendant would know what was intended. He alleges that the Information in this case did not meet this requirement. Defendant premises his argument on the State's attempt to amend the Information after entry of defendant's plea. He alleges that the State, in attempting to amend the Information, admitted the Information was defective. The trial court refused to allow the Information to be amended. However, the court itself amended Count II, the aggravated kidnapping

-17-

charge, to add the words: "resulting in the death of Peggy Lee Harstad."

We fail to see how the State's attempt to amend the Information aids the defendant in claiming the Information is not sufficient. The State by amending the Information was trying to make it a better Information. They were not claiming it was insufficient as it existed. An Information need only be sufficient to apprise the accused of the nature of the crime charged. It need not be perfect.

> "It is frequently stated, as a general rule, either with reference to statutory misdemeanors, or to statutory offenses generally, that a charge is sufficient which follows the language of the statute creating the offense; and it has been held that, if accused insists on greater particularity, it is incumbent on him to show that from the obvious intention of the legislature or known principles of law the particular case forms an exception to the general rule."
> 42 C.J.S. Indictments and Informations, §139(c).

Montana follows this general rule. An Information that properly charges an offense in the language of the statute describing the offense is sufficient. State v. Randall, (1960), 137 Mont. 534, 353 P.2d 1054; State v. Shannon, (1933), 95 Mont. 280, 26 P.2d 380; State v. Haley, (1957), 132 Mont. 366, 318 P.2d 1084; State v. Duncan, (1957), 130 Mont. 562, 305 P.2d 761; State ex rel. Glantz v. District Court, (1969), 154 Mont. 132, 461 P.2d 193.

We hold that the Information filed in this case was sufficient. Each count followed the language of the statutes for deliberate homicide, section 94-5-102, R.C.M. 1947, aggravated kidnapping, section 94-5-303, R.C.M. 1947, and sexual intercourse without consent, section 94-5-503, R.C.M. 1947.

As for the amendment by the court to Count II, contrary to defendant's contention, we find that it was a proper

amendment. Section 95-1505, R.C.M. 1947, as it existed in 1975, allowed an Information to be amended as to form after entry of plea but not as to substance. Defendant argues that the amendment to Count II was one of substance. He claims that prior to this amendment, he was not subject to the death penalty. We disagree.

We recognize that any amendment to an Information which charges a crime different in penalty is a matter of substance and impermissible. State v. Fisher, (1927), 79 Mont. 46, 254 P. 872; State v. Knight, (1963), 143 Mont. 27, 387 P.2d 22. Here, however, the amendment was one of form. Defendant knew from the very beginning the death penalty was going to be sought. Prior to the amendment to Count II, the death penalty, upon a conviction, could have been sought under either Count I or Count II. The amendment simply limited it to Count II. Furthermore, the record indicates that defendant was not surprised the death penalty was being sought. He objected to the amendment in the lower court, but he did not ask for any continuance as a result of it. He clearly knew prior to the amendment that the State was seeking the death penalty.

In any event, no legal prejudice resulted from the amendment of Count II in the light of our holding that Montana's death penalty statute as it existed in 1975 is unconstitutional.

Issue 6. On October 20, 1975, defendant filed a challenge to the jury panel claiming that it was not drawn and summoned in accordance with the jury selection statutes. The challenge was made in conformity with section 95-1908, R.C.M. 1947, which states how a jury challenge is to be made. After a full hearing on the challenge, the District Court dismissed the jury panel.

-19-

The court then ordered a new panel of 60 jurors be drawn and summoned to appear for trial on October 23, 1975. Defendant raised a second jury challenge to this panel. He again argued that the panel was not drawn and summoned in accordance with the statutes. The court denied the challenge. Defendant, on appeal, claims his second jury challenge should have been granted. We disagree.

Basically, defendant raises three arguments concerning why the jury panel that tried him was improperly drawn and summoned. First, he says that there were more numbers in the jury box than names on the jury list. There were 55,763 numbers in the box and 44,765 on the list. When a number was drawn higher than 44,765, it was returned to the box. Defendant claims that having more numbers in the jury box than names on the jury list fails to substantially comply with the jury selection statutes and constitutes reversible error.

Section 93-1402, R.C.M. 1947, requires that each name on the jury list be assigned a number. Section 93-1404, R.C.M. 1947, requires that the numbers be placed in the jury box in such a manner that they cannot be distinguished from each other. Neither of these statutes require that there be only as many numbers in the jury box as names on the jury list except there can only be one number for each juror. Defendant makes no allegation that there was more than one number for each juror. Therefore, we hold that having more numbers in the jury box than names on the jury list does not destroy the validity of the panel drawn. The purpose of these statutes is to insure that there be no unfairness in the selection of the jury. State ex rel. Henningsen v. District Court, (1959), 136 Mont. 354, 348 P.2d 143; In re

Jury Box Capsules, (1967), 150 Mont. 583, 447 P.2d 687. We find no unfairness here in the drawing of the jury panel.

Second, defendant complains that the 200 jurors drawn were notified by telephone by the District Court clerk to see if they would be available for the trial on October 23, 1975. Sixty-one of those called replied they would be available. Defendant claims that, in effect, the District Court clerk excused 139 jurors, and that, under the law, the District Court clerk may not excuse jurors from jury duty. Further, defendant claims that the jurors were allowed to excuse themselves for slight or trivial cause in violation of the statute on being excused from jury duty.

Section 93-1512, R.C.M. 1947, authorizes the District Court judge to draw and summon additional jurors for a trial when it is necessary to do so. This section further provides that the additional jurors may be notified by telephone by the clerk of court. In this case, after dismissing the first jury panel, additional jurors were needed. The District Court judge drew 200 numbers out of the jury box to get a 60 member jury panel. He authorized the clerk to orally notify the jurors. The clerk, as section 93-1512, R.C.M. 1947, authorizes, notified the jurors by telephone. Thus, defendant's claim that notifying the jurors by telephone was improper is without merit.

Section 93-1305, R.C.M. 1947, does deal with the grounds for being excused from jury duty. It provides that a juror may not be excused for slight or trivial cause. On the record that is before us, there is no showing that the clerk excused any of the jurors called. We note that the district judge had ordered the clerk to have a panel of 60 jurors for the trial on October 23, 1975, which he did. Further, the

rule in Montana is that the failure of a juror to appear, if properly notified, will not invalidate a subsequent trial, as a defendant has no right to select a particular juror, but has only a right to reject a juror. State v. Moran, (1963), 142 Mont. 423, 384 P.2d 777. Applying that rule to this case, we hold that defendant's trial should not be invalidated because 60 out of 200 jurors appeared which was the size of the panel ordered by the District Court.

Finally, defendant argues that the speed used in selecting the jury denied him his right to a fair and impartial jury panel. He argues that the jury panel did not represent a cross-section of the community as most of the jurors came from the west side of Billings, Montana.

The rule is that a defendant has a right to a fair and impartial jury selected from the proper place and drawn and summoned according to law. The systematic and intentional exclusion of a class of persons or a purposeful and deliberate design to secure the jury from a limited area instead of the entire county deprives a defendant of fundamental constitutional rights. State v. Hay, (1948), 120 Mont. 573, 194 P.2d 232. In Hay this Court found that the defendant failed to establish that he had been deprived of his right to have a jury taken from a cross-section of the county by showing that all members of the jury panel were residents of the county seat, in the absence of a showing that it was the result of deliberate design. In this case, there was no showing of deliberate design to get a jury panel from only the west side of Billings.

We hold that the jury was selected in substantial compliance with the law and that defendant's claim that he was denied a fair and impartial jury must fail.

Issue 7. Defendant claims error in improperly restricting his cross-examination of some of the State's witnesses. At the time of trial section 93-1901-7, R.C.M. 1947, governed the scope of permissible cross-examination. In substance it permits cross-examination as to any testimony elicited on direct examination or facts connected therewith and all other facts connected with the witness's testimony which tends to enlighten the jury on the question in controversy. State Highway Commission v. Bennett, (1973), 162 Mont. 386, 513 P.2d 5.

We have examined the District Court's rulings concerning cross-examination of State's witnesses Ash, Schiffer and Nank, and find no error. The questions asked were either argumentative, immaterial or otherwise answered.

Defendant also claims error in connection with his attempted cross-examination of State's expert witness Hippard from the F.B.I. laboratory concerning identification of the hairs taken from the Harstad vehicle and comparison of these hairs with defendant Coleman's hair. The District Court properly disallowed cross-examination of Hippard concerning his ability to identify hair from pictures as the witness testified that he could not look at a picture of a hair and identify it.

Hippard testified on direct examination that the only way of identifying and comparing hair was by a comparison microscope which was the method he used. Although defendant offered to submit hair samples to Hippard, he did not specifically state how this would be done or offer to furnish a comparison microscope. The District Court did tell defendant to proceed with his cross-examination and that they were then through with the witness unless defendant himself

-23-

called him on direct, which defendant did not do. The matter of permitting experiments, tests, and demonstrations is one addressed to the sound discretion of the court. State v. London, (1957), 131 Mont. 410, 310 P.2d 571; State v. Keller, (1952), 126 Mont. 142, 246 P.2d 817; State v. Thompson, (1974), 164 Mont. 415, 524 P.2d 1115. We find no abuse of that discretion here under the offer of the defendant and the District Court's rulings.

Issue 8. Defendant assigns error in the District Court's denial of defendant's challenge to Nank's mental competency as a witness.

A Montana statute provides that those of unsound mind cannot be witnesses. Section 93-701-3(1), R.C.M. 1947. It is the function of the trial judge to determine the competency of a witness to testify. State v. Newman, (1923), 66 Mont. 180, 213 P. 805. There is no presumption in that a witness is incompetent and the burden is on the party asserting the incompetency to prove it. State v. Newman, supra. This defendant did not do.

Furthermore, if a witness is sufficiently competent to understand and appreciate the nature and obligation of an oath and can correctly narrate the facts involved in the case, he may testify and the state of his mentality goes only to the weight of his testimony and not to its admissibility. Martin v. Hover, (1921), 60 Mont. 302, 199 P. 694.

We find no error by the District Court on this issue.

Issue 9. At the close of the State's case, defendant moved to dismiss the Information, or, in the alternative, for a judgment of acquittal for lack of corroboration of Nank's testimony. Corroboration of the testimony of one

responsible or legally accountable for the same offense is necessary to sustain a conviction. Section 95-3012, R.C.M. 1947. This statute requires corroboration by evidence which tends to connect the defendant with the commission of the offense, without the testimony of the person legally accountable or responsible. Defendant argues that there was not sufficient corroboration of Nank's testimony to sustain defendant's conviction. We disagree.

The rule on corroboration is stated in State v. Cobb, (1926), 76 Mont. 89, 245 P. 265. In that case, we held that the corroborating evidence may be supplied by the defendant or his witnesses; it may be circumstantial evidence; it need not be sufficient to sustain a conviction or establish a prima facie case of guilt; and it need not be sufficient to connect the defendant with the crime but must tend to connect him with the crime. In State v. Keckonen, (1938), 107 Mont. 253, 84 P.2d 341, we held that where the alleged corrobative evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of defendant, then such evidence does not tend to connect him with the commission of the offense and is in the realm of speculation, not corroboration. Where the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice. State v. Jones, (1933), 95 Mont. 317, 26 P.2d 341.

Applying those rules to this case, we hold there was sufficient corroboration of Nank's testimony to sustain defendant's conviction. The corroborating evidence is: The crack in defendant's motorcycle helmet; a hair of Peggy Lee Harstad being on the rope belonging to these men; the finger-

prints on her car and in her purse; the Negroid pubic hairs similar to defendant's and the Negroid head hair found in her car; and, the evidence that defendant and Nank were seen together on the same road and at approximately the same time that Peggy Lee Harstad disappeared. This evidence tends to connect defendant with the commission of the offenses charged. It is evidence of more than mere opportunity or suspicion that defendant committed these offenses. This evidence does not establish any reasonable explanation pointing toward innocent conduct. We find no error in the District Court's denial of defendant's motion.

Issue 10. On appeal, as at the trial, defendant raises objections to certain questions and answers elicited from the State's witnesses. He argues that these are cumulative errors requiring reversal. We do not agree.

His first objection is to Nank's being allowed, on direct examination, to testify that he had told the same story concerning the crime to the police and the F.B.I. prior to the trial. Defendant claims that this testimony was used to buttress and fortify Nank's testimony before his testimony was challenged.

Basically, the questions to Nank were to find out if Nank was testifying to the truth. This Court has held in the past that the State may ask such questions on direct examination. State v. Collett, (1946), 118 Mont. 473, 167 P.2d 584. In Collett, this Court said the District Court did not commit prejudicial error in allowing the witness to answer a question as to whether he was testifying to the truth. The rationale is that while the answer is in the nature of a self-serving declaration, it is only a reaffirmation of what the witness promises to do when he takes the

-26-

oath.  We believe this approach is sound and will follow it here.  We hold the questions and answers as to Nank's prior statements do not constitute prejudicial error.

Defendant then objects to an F.B.I. agent being allowed to testify about defendant's attitude in his interview with defendant at Sheridan, Wyoming.  Specifically, the agent testified that defendant was evasive during questioning.

We agree that this was improper opinion evidence. However, technical errors or defects will not provide a basis for reversal in a criminal prosecution.  State v. Gallagher, (1968), 151 Mont. 501, 445 P.2d 45.  We hold that the admission of this testimony was only a technical error and is not a basis for reversal.

Next, defendant argues that a F.B.I. fingerprint expert was allowed to testify on re-direct examination beyond the scope of cross-examination.  The questions to which the defendant objected concerned the date on which the F.B.I. laboratory received certain fingerprint cards.  The record reveals there was some confusion as to the dates various fingerprint cards were received.  Under those circumstances, the District Court did not abuse its discretion in allowing the State to clarify the issue on re-direct.

Finally, defendant objects to witness Makin testifying as to where he was told certain hairs came from.  Defendant claims this was hearsay.  An earlier witness, Ash, who was the declarant, testified as to where he found the hairs.

Here, Undersheriff Makin was testifying to establish the chain of evidence.  He had received the hairs from Officer Ash, who told Makin he obtained the hairs from the abandoned Harstad vehicle.  Thus, the declaration of Ash was a part of the chain of evidence.

We find no cumulative error in the testimony of the

State's witnesses sufficient to warrant reversal.

Issue 11. Defendant objects to certain instructions which were given to the jury and offered instructions that were refused. We find the jury was properly instructed.

Defendant's first objection is to Instruction 22. This instruction was that if the jury found defendant committed a homicide and no circumstances of mitigation, excuse or justification appears, they may infer that the homicide was committed knowingly and purposely. This instruction was based on section 95-3004(2), R.C.M. 1947. The instruction follows the statute. Defendant argues that instruction as a statutory presumption is unconstitutional, citing Leary v. United States, (1969), 395 U.S. 6, 89 S.Ct. 1532, 23 L ed 2d 57. This case provides that to have a valid criminal statutory presumption, the presumed fact must more likely than not flow from the proved fact on which it depends.

We find this instruction and statute are constitutionally valid. The jury was instructed that they "may" find knowledge or purpose when there are no circumstances of mitigation, excuse, or justification. They are not required to find this. Thus, it is not a conclusive presumption. The instruction and statute do not violate the Leary requirement because a finding of knowledge or purpose would more likely than not flow from the proved fact that a homicide was committed by defendant and where there were no circumstances of mitigation, justification, or excuse.

Defendant objects to Instruction 26, which gave the statutory definition of "knowingly", and further objects that his offered Instruction 16, which dealt with criminal intent and premeditation, was not given. Instruction 26 was the statutory definition of "knowingly" as contained in

section 94-2-101(28), R.C.M. 1947. The portion of the statute and instruction defendant objects to is: "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence." Defendant argues that this definition does not comply with the traditional requirements of criminal intent. That is why, according to defendant, his offered Instruction 16 should have been given as it explained the criminal intent and premeditation necessary for a conviction of deliberate homicide.

We believe there was no error in the court's giving of Instruction 26 and refusing to give defendant's Instruction 16. We have considered the necessity of instructing the jury on criminal intent and premeditation before. State v. Sharbono, (1977), ____ Mont. ____, 563 P.2d 61, 34 St.Rep. 196. In that case, we found no error in the District Court's refusal to give an instruction identical to defendant's offered Instruction 16. There, we held that the legislature had changed the requirements of mens rea. This Court said, in discussing the question of criminal intent:

> "Upon the whole it is the person who means
> to do the thing that constitutes a crime,
> knows he is doing it, and knows that there is
> a substantial and unjustifiable risk in doing
> it, whose conduct warrants condemnation of the
> kind from which conviction results." Sharbono,
> 563 P.2d at 72.

Therefore, we find the court properly instructed the jury as to the "knowledge" required for a conviction in Instruction 26 and properly refused defendant's Instruction 16.

Defendant objects that his offered Instruction 10 was not given. This instruction deals with the burden of proof. It comes from State v. Halk, (1914), 49 Mont. 173, 141 P. 149.

The Court adequately instructed the jury concerning the burden of proof in Instruction 4. Thus, there is no error in refusing defendant's offered Instruction 10.

Next defendant complains that his proposed Instruction 14 on reasonable doubt was not given. We believe the court rightfully refused this instruction since the jury was adequately instructed on reasonable doubt in the court's Instructions 5, 6, 7, and 10. Defendant's proposed instruction would have only been redundant, and, therefore, was unnecessary.

Defendant contends that his offered Instruction 34 should have been given. This instruction dealt with the jury not having to decide in conformity with the greater number of witnesses if their testimony does not produce conviction in their minds. Defendant argues that with the number of witnesses the State produced, he was entitled to this instruction. We disagree.

We must point out that the instruction defendant proposed was adequately covered in the court's Instruction 2. This instruction read in part:

> "You are not bound to decide in conformity with
> the declarations of any number of witnesses,
> not producing conviction in your minds, against
> a less number or against a presumption or other
> evidence satisfying your minds. The direct
> evidence of one witness who is entitled to full
> credit is sufficient for the proof of any fact
> in this case."

This is a standard Montana Jury Instruction Guide instruction which correctly states the law. The District Court was correct in refusing defendant's offered Instruction 34 covering the same subject.

Next, defendant alleges that his offered Instruction 35A should have been given. This instruction was on the lesser included offense of mitigated deliberate homicide.

Where there is no evidence of mitigation that would fit within the statutory definition of mitigated deliberate homicide, section 94-5-103, R.C.M. 1947, the trial court should properly refuse to instruct on such crime. State v. Baugh, (1977), ____ Mont. ____, 571 P.2d 779, 34 St.Rep. 1315. In viewing the record here, we find no evidence of mitigation. This instruction was properly refused.

Defendant also objects to Instruction 40. This instruction told the jury that sentencing was vested in the court and the jury was not to consider the possible punishment defendant could receive in reaching a verdict. Defendant's objection is that in this instruction, and in voir dire of the jury, the jury was led to believe that the judge had discretion in imposing the death penalty.

This instruction simply told the jury sentencing was up to the judge. The instruction does not state that the judge can mitigate punishment. It only says that he has the power to impose punishment, which is correct. It is where the jury is instructed as to the various possibilities of sentence that prejudice to the defendant exists. State v. Zuidema, (1971), 157 Mont. 367, 485 P.2d 952. This is not the case here. The instruction was proper.

Finally, defendant objects to the special verdict form used on Count II. The jury was specifically asked to find if Peggy Lee Harstad died as a result of the aggravated kidnapping. The jury found that she did. Defendant argues that Montana law does not provide for specific factual findings by the jury.

The jury was given general verdicts asking for a finding of guilty or not guilty on each count. The jury was to make the additional finding that the element necessary for the

imposition of the death penalty was present. Under those circumstances, this additional factual finding does not fall into the vice of a special verdict. It does not require a fact determination which could be used to undermine the general verdict. Thus, the verdict forms were permissible.

In any event, our holding on Montana's death penalty statute renders this specification of error nonprejudicial.

Issue 12. Defendant objects to some exhibits which were admitted into evidence and some of his own which were refused admission.

His first objection is to State's Exhibit 20. This was a picture of the area in which Peggy Lee Harstad's body was found. In the picture, her decomposed body can be seen. Defendant argues that this picture was prejudicial because it is a gruesome photograph. He claims that any relevancy of this photograph is outweighed by its prejudicial effect.

This Court has held that photographs which help the jury understand the case are admissible, but photographs that are calculated to arouse the sympathies or prejudices of the jury are properly excluded. State v. Bischert, (1957), 131 Mont. 152, 308 P.2d 969. This Court went on to say, in that case, that photographs may not be used if intended to inflame the minds of the jury rather than enlighten them as to the facts. We affirm the rule of the Bischert case, but reject its application to this case.

In Bischert, the photograph was extremely distasteful and did not make a significant contribution to the development of the facts in that case. This is not the case here. We have examined the photograph and find that it is hazy, indistinct, and of poor quality. Any gruesome character that the photograph might otherwise possess is lost in its

-32-

development and reproduction. The photograph is relevant in that it shows the jury the area in which the body was found; and it corroborates Nank's testimony as to her being fully clothed and as to where the body was. Under the circumstances here, the photograph's probative value outweighs its prejudicial effect.

Defendant objects to the admission of two other photographs, namely, State's Exhibits 41 and 43. These were pictures of the apartment building and the parking lot in Boise, where defendant and Nank were arrested. Defendant argues that these photographs were irrelevant and cumulative evidence.

As a general rule, photographs, when relevant to describe a person, place or thing, are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. Fulton v. Chouteau County Farmers' Co., (1934), 98 Mont. 48, 37 P.2d 1025. The photographs of the apartment building and parking lot helped to describe the place where the defendant and Nank were arrested. These photographs showed where the helmets and rope were recovered. These photographs assisted the jury in understanding the arrest and search in Boise. They were properly admitted.

Defendant also objects to the admission of Nank's motorcycle helmet into evidence. His complaint is that the chain of evidence was not established prior to the admission of the helmet and further complains that he was not allowed to voir dire Nank prior to its admission. Defendant states there was a problem with the chain of evidence in that this helmet was labeled as belonging to defendant and not Nank.

Since Nank, prior to the admission of the helmet, positively identified it as his, we find the chain of evidence established prior to its admission. The mismarked label is of no consequence as the label was not admitted into evidence. We recognize that defendant might have been allowed to voir dire Nank prior to the admission into evidence of the helmet but such was not required. There is no indication that such a voir dire would have produced a different result. At most, only a procedural error not affecting the merits was involved, and not a prejudicial error requiring reversal. State v. Heiser, (1965), 146 Mont. 413, 407 P.2d 370.

Defendant further claims error in admitting in evidence the waiver of rights form given to defendant in Boise, which he refused to sign. Defendant claims this exhibit was irrelevant and should have been excluded as cumulative evidence.

We can find no error in the admission of this exhibit. This exhibit aided in the jury in understanding the events of this case that occurred in Boise, Idaho. It supported the testimony of the Boise detectives as to the date of the arrest, the time of the arrest, and that defendant was informed of his constitutional rights. The exhibit was properly admitted.

Defendant objects that his Exhibits V, W, X and Y were refused. These exhibits were pictures of the State's fingerprint photos. They were enlargements and an overlay of them was made. By use of the overlay, defendant wanted to show any differences in the fingerprints.

Our review of the record indicates that defendant did not lay a foundation, prior to moving for the admission of his exhibits, showing that fingerprints could be compared in

-34-

the manner defendant was attempting to compare them. What defendant wanted to do was to show the jury by actual measurement the difference in the distance between the ridges between a known print of defendant and the print found in Peggy Lee Harstad's purse. A fingerprint cannot be compared in this manner. The same fingerprint will produce differing results with respect to a measurement between the ridges depending upon the pressure applied in making the print and the manner in which the print was left upon the surface. Fingerprints are compared by determining if the same ridge characteristics are present in a known print and unknown print. These ridge characteristics will not vary between the different ways in which an impression is made on a surface.

The rule is that the determination of whether a proper foundation has been laid in order to introduce exhibits into evidence rests with the lower court and its determination will not be overturned unless there is a clear abuse of discretion. State v. Olsen, (1968), 152 Mont. 1, 445 P.2d 926. Here, the District Court properly excluded the exhibits because no proper foundation was laid for their admission.

Finally, defendant claims that the court erred in refusing his Exhibit T showing some calculations as to the height of the water level in the Yellowstone River on July 4, 1974.

This exhibit was to aid defendant's argument that Peggy Lee Harstad was not drowned in the river as Nank testified she was. Defendant was trying to prove that the river, on July 4, 1974, was too deep, in the area where the body was found, for Nank and defendant to be holding her under the water. This exhibit was not admissible because of a lack of a proper foundation. Our review of the transcript reveals

that the witnesses who prepared this exhibit were never shown to have the qualifications to prepare such an exhibit; it was not made clear how they arrived at the calculations they made of the height, flow, and volume of the river; and, it was not established that their calculations of the height of the river on July 4, 1974, were competent. Under such circumstances, there was no error in denying this exhibit admission in evidence.

Issue 13. Following his conviction, defendant moved for a new trial. One of the grounds defendant raised was that after both sides had rested their case, defendant was contacted by a witness who knew of defendant's good conduct and character. Defendant argues that this newly discovered evidence is grounds for a new trial under section 95-2101, R.C.M. 1947.

> "It is well-settled that a new trial will not be granted upon the ground of newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial. It is only when it is shown by competent and satisfactory evidence that appellant would not have been convicted, but for this evidence, that a new trial will be granted for newly discovered evidence. (Citations omitted.)" State v. Schleining, (1965), 146 Mont. 1, 17, 403 P.2d 625.

In this case, defendant's newly discovered evidence would only go to discredit Nank's testimony and defendant has not shown that this evidence would make the difference between his being or not being convicted in a new trial. Under those circumstances, we will follow the general rule in finding no error in the denial of defendant's motion for a new trial.

We have examined the subsidiary contentions of defendant and find that none would change our holdings in this case or merit special discussion in this opinion.

The judgment of conviction on all three counts is affirmed. The sentences imposed for Counts II and III are vacated. The case is remanded to the District Court for resentencing on Counts II and III.

_____
                    Chief Justice

We Concur:

_____
        Justice

_____
Hon. L. C. Gulbrandson, District
Judge, sitting in the vacant seat
on the Court.

Mr. Justice John Conway Harrison concurring in part and dissenting in part.

I concur in the opinion but dissent as to the majority's disposition of Issue 2. The majority finds no substantial evidence to support the jury's determination that defendant inflicted bodily injury in the course of committing sexual intercourse without consent. Section 94-5-503(3), R.C.M. 1947, provides:

> " * * * if the offender inflicts bodily injury upon anyone in the course of committing sexual intercourse without consent, he shall be imprisoned in the state prison for any term of not less than 2 years or more than 40 years, except as provided in 95-2206.18."

The majority freely admits "the evidence shows that defendant did commit sexual intercourse without consent" and the jury so found. Nor is there any quarrel that there is substantial evidence showing that defendant participated in the killing of Peggy Lee Harstad. These facts were proven to the jury despite the fact, as the majority notes, the pathologist could find no evidence of physical injury to her badly decomposed body. While the majority is unclear in what respect the State's proof was lacking, the State must have failed to prove either that (1) defendant inflicted "bodily injury" on the victim, or (2) the bodily injury was inflicted in the course of the commission of the rape.

Undoubtedly, there is substantial evidence that defendant inflicted bodily injury on the victim. As noted above, the evidence indicates defendant participated in causing her death. Certainly death is "bodily injury" within the meaning of the statute. That death is "impairment of physical condition" is so obvious that it deserves little comment. Section section 94-2-101(5), R.C.M. 1947. To hold otherwise would lead to absurd results. For example, a person who breaks the arm of the victim in the course of committing a rape can receive a 40 year sentence for the rape, but a rapist who kills the victim can receive no more than a 20 year sentence

-38-

for the rape.  I cannot believe the legislature intended that a rapist receive a lighter sentence because he did more harm to the victim than is required by the definition of "bodily injury".

If death is, indeed, bodily injury, the only remaining requirement is that the death be inflicted "in the course of committing sexual intercourse without consent".  This phrase is explained in section 94-5-503(4), R.C.M. 1947:

> "An act 'in the course of committing sexual intercourse without consent' shall include an attempt to commit the offense <u>or flight after</u> the attempt or commission."  (Emphasis added.)

Clearly there is substantial evidence to show the victim was killed in the "flight after" the commission of the rape.  According to Nank's testimony, she was raped in her car, and then beaten and drowned nearby.  Had she lived, she would have been able to identify defendant and Nank as the perpetrators.  The jury certainly would have been reasonable to infer that she was killed in an attempt to cover up the commission of the rape.  The majority completely ignores the "flight after" language of the statute.

In summary, I find substantial evidence to support the jury's verdict that defendant inflicted "bodily injury" upon the victim "in the course of committing sexual intercourse without consent".  Her death supplied all the "bodily injury" required.  Her death was inflicted in the course of committing the rape because it was an integral part of the flight after the commission of the offense.  This is precisely the type of conduct the statute was intended to punish to the most severe extent.

I would affirm the imposition of the 40 year sentence.

_____ Conway Harrison _____
Justice

-39-

Mr. Justice Daniel J. Shea dissenting:

I agree with the majority opinion holding section 94-5-304, R.C.M. 1947, to be unconstitutional. Clearly, the United States Supreme Court has prohibited mandatory death penalties because there is no allowance for consideration of mitigation. However, I would go yet another step and reverse the conviction because the second jury panel was not chosen in substantial compliance with the applicable statutes of calling in a new jury array. In fact, there was a complete failure to follow sections 93-1501 and 93-1509, R.C.M. 1947.

The majority proceeds with this issue as though the District Court was only calling in additional jurors to complement the jury panel already legally in existence. The law involved is contained in Title 93, Chapter 15, entitled "Jurors--Drawing and Summoning for Courts of Record." Section 93-1512, R.C.M. 1947, upon which the majority relies, is but one of the statutes covering the selection of juries. That section provides:

> "Obtaining additional jurors when necessary.
> Whenever it appears to a district judge that
> additional jurors will be needed for any term
> or  trial    the judge shall draw as many numbers
> from jury box No. 1 as are necessary to secure
> the required number of additional jurors. Before
> drawing the numbers the judge shall by appropri-
> ate order designate the number of jurors needed,
> and, when the judge believes that securing the
> additional jurors from all of the county would
> cause unnecessary delay or expense then he may
> order the jurors selected from only a designated
> portion of the county, which portion shall never
> be less than the corporate limits of the county
> seat. If, in the selection of the additional
> jurors, a number is drawn and the jury list shows
> the person represented by the number to be a
> resident of an area outside the area designated
> by the court order then that number shall be
> returned to the jury box and a new number drawn.
> When the required number of names have been se-
> lected the judge may order the prospective jurors
> notified by telephone by the clerk of the court
> or he may order them summoned by the sheriff
> either by certified mail or by personal service."
> (Emphasis added.)

This statute allows additional jurors to be summoned by telephone (as one of the means of summoning a juror) where the jury array, then legally in existence, is not sufficient in number to complete the work of the court during the term of court. It does not apply where the legal existence of a jury array has been successfully challenged and it therefore becomes necessary to summon an entirely new jury panel--precisely what occurred in this case. The entire jury panel was excused because it was not summoned in compliance with the applicable statutes. The majority recognizes that this happened by stating:

> "* * * On October 20, 1975, defendant filed a
> challenge to the jury panel claiming that it was
> not drawn and summoned in accordance with the
> jury selection statutes. The challenge was made
> in conformity with section 95-1908, R.C.M. 1947,
> which states how a jury challenge is to be made.
> After a full hearing on the challenge, the Dis-
> trict Court dismissed the jury panel." (Emphasis
> added.)

Clearly, upon this dismissal, the jury panel was no longer legally in existence. If any more cases were to be tried during that jury term, an entire new jury panel had to be summoned. In such case sections 93-1501 and 93-1509, R.C.M. 1947, come into play. Section 93-1501, "Summoning of trial jury", provides:

> "At least once each year in each county when a
> civil or criminal case has been at issue and
> ready for trial for more than six (6) months
> and the plaintiff or defendant in such case has
> requested a jury trial or whenever the business
> of a district court requires the attendance of
> a trial jury for the trial of civil or criminal
> cases, and no jury is in attendance, the court
> must make an order directing a trial jury to be
> drawn and summoned to attend before said court.
> Such order must specify the number of jurors to
> be drawn, and the time at which the jurors are
> required to attend, which time may be at the
> same term in which the jurors are drawn, or at
> the next succeeding term, in the discretion of
> the court. And the court may direct that such
> causes, either criminal or civil, in which a
> jury may be required, or in which a jury may
> have been demanded, be continued and fixed for
> trial when a jury shall be in attendance."
> (Emphasis added.)

Thereafter, the statutes providing for the mechanics of selecting a jury panel (sections 93-1503 et. seq.) are followed until the requisite number of jurors is chosen from the jury list and jury boxes. After this is done, the jurors are then summoned in the manner as provided in section 93-1509, which provides:

> "The sheriff, as soon as he receives a list or lists of jurors drawn, shall summon the persons named therein to attend the court at the time mentioned in the order, by a written notice by certified mail to that effect addressed to them to the post-office address named in the jury list and deposited in the post office with the postage thereon prepaid, except in cases where the district judge expressly directs that such service shall be made by giving personal notice, and shall return the list to the court at the opening of the regular session thereof, or at such session or time as the jurors may be ordered to attend, specifying the names of those who are summoned, and the manner in which each person was notified." (Emphasis added.)

There can be no question that sections 93-1501 and 93-1509 must be followed in circumstances where a jury panel is not already legally in existence. Section 93-1512 applies only where for some reason there are not sufficient numbers on the original panel to complete the business of the court for the particular term involved. Here, the District Court entirely ignored sections 93-1501 and 93-1509 and the majority has approved this bypass. The procedure actually used by the District Court is fraught with dangers and is hardly the procedure to be approved for summoning an entire jury panel when a man is on trial for his life.

Here, a District Court, after dismissing an entire jury panel for procedural irregularities in the summoning process, commits an error equally as grave in allowing the clerk of court to obtain sixty willing jurors by calling them on the telephone.

We have no idea of the actual number of jurors called before sixty of them agreed to sit. We do not know the exact procedure used by the clerk in calling the jurors. Did he go down the list alphabetically and continue calling until he obtained the required

number of jurors? Did he call jurors in areas of Yellowstone County where, from previous experience, he determined it would be most likely to get an affirmative response? Did he in fact call most of the jurors first who lived on the west side of Billings, commonly known to be the area where "successful" people live? What did the clerk of court tell each person when he called? What excuses did the potential jurors give if they stated they could not sit on the jury panel? Did they have a legal excuse for not appearing? Did the clerk tell the jurors what excuses would be permissible? We will never know the answers to these questions. Of one thing, however, I am certain. If it so happened that the sixty jurors ultimately serving were a true cross-section of the residents of Yellowstone County, it was an accident. It did not occur because the District Court scrupulously followed the law. Under these circumstances, it is a travesty to allow the conviction to stand.

In State v. Fitzpatrick, (1977), ____ Mont. ____, 569 P.2d 383, 388, 34 St.Rep. 736, 740, this Court stated:

> "This Court has long held the accused in a criminal prosecution is constitutionally guaranteed a trial by an impartial jury selected and drawn in accordance with the law. State ex rel. Henningsen v. District Court, supra; State v. Hay, 120 Mont. 573, 194 P.2d 232; Dupont v. McAdow, 6 Mont. 226, 9 P. 925. Any material deviation or departure in procuring a jury has been held to constitute a denial of fundamental constitutional rights. State v. Porter, supra; State v. Groom, 49 Mont. 354, 141 P. 858; State v. Tighe, 27 Mont. 327, 71 P. 3; reversed on other grounds 35 Mont. 512, 90 P. 981." (Emphasis added.)

In the present case there was not only a material departure in procuring a jury, there was a total failure to follow the applicable law. Clearly, the defendant has been denied a fundamental constitutional right.

For the foregoing reason I would reverse defendant's conviction and order a new trial.

Daniel J. Shea
Justice