No. 80-335

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

STATE OF MONTANA,

Plaintiff and Appellant,

vs.

DONALD ANDERSON WARREN,

Defendant and Respondent.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone.
Honorable William Speare, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Corbin Howard argued, Deputy County Attorney, Billings, Montana

For Respondent:

Moses Law Firm, Billings, Montana
Stephen Moses argued, Billings, Montana

Submitted: March 24, 1981

Decided: May 20, 1981

Filed: **MAY 20 1981**

_Thomas J. Kearney_
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Defendant was convicted of the offense of tampering with or fabricating physical evidence pursuant to section 45-7-207(1)(a), MCA. Defendant moved the court for a judgment notwithstanding the verdict and for a new trial; the new trial was granted.

The defendant in this case, Donald Warren, is the father of Ray Warren who was arrested on a deliberate homicide charge arising out of a shooting which occurred August 15, 1979. The defendant has been charged with suppressing material evidence, specifically a .22 caliber pistol, in connection with the investigation of his son on the deliberate homicide charge.

The basis of the case against defendant, Donald Warren, stems from the testimony of Norman Hopkins. Hopkins, who lived with the defendant's daughter, Kim Warren, and was a friend of the Warren family, testified that he had received a .22 caliber pistol from Donald Warren the afternoon following the arrest of Ray Warren on deliberate homicide charges. Hopkins testified that he recognized the pistol as being one that Ray Warren had taken when he accompanied Hopkins on several coyote hunting trips. Hopkins testified that the defendant, Donald Warren, stated the gun was possibly unregistered and that he did not want the police to find it in the Warren house because of its uncertain legality. Hopkins testified that he was instructed by defendant, Donald Warren, to dispose of the gun, not because it had anything to do with the pending homicide charges against his son, but rather because the weapon was not registered. Hopkins then stated he had possession of the gun from that time, August

-2-

15, 1979, until December 3, 1979, when he gave it to the police. Hopkins gave the weapon to the police after he had severed his relationship with Kim Warren. Ray Warren, after posting bond, disappeared and has never been tried on the deliberate homicide charge.

Both the state and the defendant raised numerous issues for review. Three issues are dispositive: (1) Was Hopkins, as a matter of law, an accomplice? (2) If Hopkins was an accomplice, as a matter of law, then was there any evidence to corroborate his testimony? (3) Did the District Court err in granting a new trial?

Section 45-2-302(3), MCA, defines the elements of being an accomplice, pertinent to this case. One is legally accountable for another's conduct if ". . . either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense."

The only direct evidence bearing on the issues of defendant's intent and Hopkins being an "accomplice" is the testimony given by Hopkins at time of trial. Hopkins testified that he intended to dispose of the .22 caliber pistol because he was told by the defendant, Donald Warren, that the pistol was unregistered and perhaps illegal. Therefore, Hopkins contends he did not aid Donald Warren in suppressing evidence material to a homicide investigation; rather Hopkins contends his only intent was to dispose of an unregistered gun. If the jury believed that this was actually defendant's reason for disposing of the pistol, the jury would necessarily have acquitted the defendant, Donald Warren, because he was charged with suppressing evidence in a homicide investigation.

The jury obviously chose to disbelieve the fact of "no registration" as being the reason for disposal of the weapon.

If Hopkins' testimony could be considered there were then facts /from which the jury could infer intent to suppress material evidence in a homicide investigation. At the time Hopkins claimed defendant, Donald Warren, delivered the .22 caliber weapon to him with instructions to dispose of same, both Hopkins and defendant knew Ray Warren, defendant's son, was in jail and that a homicide investigation was being conducted. The jury inferred from these circumstances that defendant, having this knowledge, intended to dispose of the .22 caliber weapon so that it could not be used as evidence to convict his son. However, this same inference would necessarily have to be drawn about the motives of Hopkins. If twelve reasonable minds inferred from the evidence that defendant, Donald Warren, intended to suppress the weapon because it was potential evidence in a homicide case, those same twelve reasonable minds would have to infer that the same intent existed for Norman Hopkins. This inference would necessarily make Hopkins an accomplice as a matter of law.

We have carefully examined this record to determine if there was any corroboration to support the testimony of Norman Hopkins. This case presents a perfect illustration of why an accomplice's testimony must be corroborated. Without corroboration, an innocent man could be convicted by the testimony of one with a strong motive for seeing that such a conviction occurred. Norman Hopkins had opportunity for access to the son, Ray Warren, following the shooting. Had Ray Warren disposed of the .22 caliber pistol through Norman Hopkins, Hopkins could later exonerate himself and convict the father, Donald Warren, simply by relating the

-4-

story which was given under oath in this case.

In order to corroborate the testimony of Hopkins, it was necessary for the state to show that the .22 caliber weapon could be traced from the homicide scene back to the Warren residence, where defendant, Donald Warren, would have access to the weapon. The state was able to show that the gun was at the residence prior to the alleged homicide. Of course, if the gun was owned by Ray Warren, it most likely would have been at his residence. However, the critical inquiry must be directed toward its location after the shooting. There was absolutely no corroborative evidence, either direct or circumstantial, which would provide a basis for finding that the weapon traveled from the alleged homicide scene to the Warren residence.

The state contends that the presence of Ray Warren's vehicle at the Warren residence several hours after the shooting occurred, tends to provide corroboration. This evidence only proves that Ray Warren may have returned to his residence following the shooting, but it does not prove the location of the weapon. It seems probable that Ray Warren may have disposed of the weapon prior to returning his vehicle to the Warren residence. It seems implausible that Warren would have taken the weapon to his home where police would most likely conduct a search. In fact, such a search was conducted several days later and no .22 caliber pistol was found.

At the time of the search, a spare clip for the .22 caliber pistol was found in the glove compartment of an automobile owned and driven by Joy Warren, wife of the defendant. The state argues that this provides corroboration. However, the presence of a spare clip only tends to prove

that the .22 caliber pistol was on the premises at some time. The critical question is not whether the subject pistol belonged to Ray Warren or whether it had been at the Warren residence on prior occasions; the determinative question is whether there is any evidence, other than Hopkins' testimony, to show that the weapon moved from the alleged homicide scene back to the Warren residence. We can find no evidence in the record to corroborate Hopkins' testimony that the defendant, Donald Warren, was ever in possession of the .22 caliber pistol following the shooting of August 14, 1979.

Section 46-16-213, MCA, sets forth the requirement of corroboration for accomplice testimony. It states: "A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense . . . unless the testimony is corroborated . . ." The statute requires that the testimony be corroborated by independent evidence tending to connect the defendant with the commission of the offense. In State v. Kemp (1979), ___Mont.___, 597 P.2d 96, 36 St.Rep. 1215, this Court discussed the character, scope and sufficiency of corroborating evidence:

> "To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. (Citation omitted.) It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. (Citation omitted.) But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. (Citation omitted.) Corroborating evidence may be circumstantial (citation omitted) and can come from the defendant or his witnesses." (Citation omitted.)

In the case at bar, only Hopkins' testimony established the defendant's action in transferring the pistol. Therefore, as a matter of law, there was no corroborating evidence to support a conviction.

In ruling on the defendant's motion for a judgment not-withstanding the verdict, or in the alternative for a new trial, the lower court stated:

> ". . . and that was the only testimony about the gun--was Hopkins. I was in hopes that this would be in corroboration. I was in hopes that this Allore would testify, but that can still be done . . .

> "In any event, that's the decision of this Court, and there will be a new trial."

These statements show that the lower court substantially agreed with the proposition that Norman Hopkins was an accomplice and that his testimony was not corroborated. However, the lower court indicates that the state's failure to present sufficient corroborating evidence could be cured perhaps at a second trial. Such action places the defendant in double jeopardy and is not constitutionally permissible. Burks v. United States (1978), 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1.

In Burks the United States Supreme Court held that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." 437 U.S. at 11, 98 S.Ct. at 2147, 57 L.Ed.2d at 9.

This holding was limited to situations where a reversal of a lower court determination was necessitated because of evidentiary insufficiency, not because of trial error. In the case at bar, this Court is faced with the precise problem of evidentiary insufficiency. We have determined that Norman Hopkins' testimony renders him an accomplice of the defendant as a matter of law and that the state failed to present sufficient evidence corroborating Hopkins' testimony. Therefore, no evidence exists to support a conviction of the

defendant. Allowing the state a second chance to buttress its case would expressly violate the principle espoused in Burks v. United States, supra.

This Court has also held that a new trial cannot be granted where the evidence adduced at the first trial is insufficient to support a conviction. State v. Johnson (1978), 177 Mont. 182, 188, 580 P.2d 1387, 1390; State v. Langan (1968), 151 Mont. 558, 568, 445 P.2d 565, 570. Thus, the question becomes: What is the proper remedy?

In Burks v. United States, supra, the United States Supreme Court stated that, ". . . Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." 437 U.S. at 18, 98 S.Ct. at 2150-2151, 57 L.Ed.2d at 14. The Supreme Court further stated that such action was the proper remedy regardless of whether the defendant ". . . sought a new trial as one of his remedies, or even as the sole remedy." 437 U.S. at 17, 98 S.Ct. at 2150, 57 L.Ed.2d at 13. The court concluded by stating, ". . . To the extent that our prior decisions suggest that by moving for a new trial, a defendant waives his right to a judgment of acquittal on the basis of evidentiary insufficiency, those cases are overruled." 437 U.S. at 18, 98 S.Ct. at 2151, 57 L.Ed.2d at 14. This Court adopts the principles established by the United States Supreme Court in Burks v. United States, supra; therefore, a judgment of acquittal is the proper remedy in this case.

In conclusion, we find that Norman Hopkins was an accomplice as a matter of law and that before this case could be submitted to a jury, it was incumbent upon the

state to produce independent corroborating evidence. We find that the state failed to produce sufficient evidence of corroboration necessary for creation of a jury issue and that, therefore, the state's case fails as a matter of law.

This case is remanded to the District Court with directions to enter a judgment of acquittal for defendant, Donald Warren.

_____
Justice

We concur:

_____

_____

_____
Justices

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

No. 80-335

----------

DISSENT OF MR. JUSTICE DANIEL J. SHEA

----------

STATE OF MONTANA,

     Plaintiff and Appellant,

  vs.

DONALD ANDERSON WARREN,

     Defendant and Respondent.

DATED:  June 5, 1981

FILED

JUN 5 - 1981

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

I would reverse the District Court ruling granting a new trial and affirm the conviction.

The majority is clearly in error on two fundamental conclusions. First, Norman Hopkins was not, as the majority has concluded, an accomplice as a matter of law. Therefore, his testimony was not subject to the rigid rules governing corroboration of accomplice testimony. Second, assuming that Norman Hopkins was an accomplice, his testimony was sufficiently corroborated by independent evidence, and therefore, his conviction must be affirmed.

The majority makes two particularly glaring misstatements which seem to be the basis for its conclusion that Norman Hopkins was an accomplice as a matter of law. First, the majority reasons that if the jury believed that Norman Hopkins got rid of the pistol because he was told by defendant Donald Warren that it was unregistered, that the jury must also have believed that defendant Donald Warren gave the gun to Hopkins to get rid of because it was unregistered. That is a totally unfounded conclusion, and certainly not one the jury was required to make based on the evidence presented in this case. There is not a shred of evidence in the record to show that Norman Hopkins knew he was getting rid of a murder weapon when defendant Donald Warren asked him to dispose of the pistol. There is, on the other hand, circumstantial evidence from which the jury could reasonably believe that defendant Donald Warren knew it was a murder weapon, or at least knew that it might be a murder weapon, when he gave it to Norman Hopkins to dispose of.

The evidence to support the jury's conclusion as to defendant Donald Warren's intent does not come from the

-10-

testimony of Norman Hopkins. Rather, it comes from the testimony of Captain Charles Hensley of the Billings City Police Department, and Al Ketterling of the Yellowstone County Sheriff's Department. It also comes from the reasonable inference a jury could make in concluding that Ray Warren drove his car almost directly from the murder scene to the home of Donald Warren, and that Ray Warren left the pistol at the Donald Warren home.

Second, the majority is clearly wrong in concluding that the jury was required to infer that Norman Hopkins intended to dispose of a murder weapon if the jury inferred that defendant Donald Warren intended to dispose of a murder weapon. The opinion states:

> ". . . If twelve reasonable minds inferred from the evidence that defendant, Donald Warren, intended to suppress the weapon because it was twelve/ potential evidence in a homicide case, those same/ reasonable minds would have to infer that the same intent existed for Norman Hopkins. This inference would necessarily make Hopkins an accomplice as a matter of law."

This conclusion rests on an assumption that Norman Hopkins knew exactly what defendant Donald Warren knew concerning the status of the investigation and that the police were looking for a .22 caliber pistol or a .22 caliber weapon as the probable murder weapon. The evidence is to the contrary. The uncontradicted testimony of Norman Hopkins is that he did not know he was disposing of a murder weapon. There is not a shred of evidence in the trial record that Hopkins did know that defendant Donald Warren had handed him a murder weapon to dispose of. This being so, why would the jury have to infer that Norman Hopkins must have had the intent to dispose of the murder weapon if the jury inferred on the basis of the entire evidence in the record, that defendant Donald Warren had such intent? There is direct

-11-

testimony in the record that defendant Donald Warren was told by Captain Hensley that the police were looking for a .22 caliber automatic pistol or at least a .22 caliber weapon. Further, defendant Donald Warren had additional knowledge concerning the status of the investigation and the focusing of the police on his son Ray Warren, as the suspect. The record does not show that Norman Hopkins had this knowledge. The jury was entitled to convict defendant Donald Warren on the basis of that knowledge and of the entire circumstances surrounding the disposal of the pistol.

I fail to understand the reasoning of the majority in concluding (without support in the record) that Norman Hopkins was an accomplice as a matter of law. If he was an accomplice as a matter of law, the trial court was required to so instruct the jury. But Hopkins could not be an accomplice as a matter of law unless the jury chose to <u>disbelieve</u> his testimony and therefore to infer that contrary to his testimony, Hopkins did know he was receiving a murder weapon from defendant Donald Warren and that Hopkins had the intent to dispose of a murder weapon. There is certainly evidence in the record through the direct testimony of Norman Hopkins by which the jury could believe that Norman Hopkins did not know he was receiving and disposing of a murder weapon. The jury could reach a contrary conclusion only if they chose not to believe Norman Hopkins. The jury chose to believe him. Once the jury chose to believe Hopkins, he was not an accomplice, and therefore his testimony did not have to be judged by the standards applicable to accomplice testimony.

Furthermore, even assuming that Norman Hopkins was an accomplice because he knew he was receiving and disposing of a murder weapon handed to him by defendant Donald Warren, his testimony was sufficiently corroborated, and therefore the

-12-

conviction should still be affirmed. In concluding that Hopkins' testimony was uncorroborated, the majority erroneously focuses on the necessity of demonstrating that defendant Donald Warren received the murder weapon from his son, Ray Warren. Although the evidence certainly circumstantially points to that conclusion, it is not necessary that defendant Donald Warren received that gun from Ray Warren. All that is necessary is that when defendant Donald Warren gave it to Norman Hopkins, he knew or was suspicious that it was the murder weapon and therefore that it was part of the continuing investigation of the murder of Carl Ray Malcom. The circumstantial evidence points clearly to that conclusion. This evidence is sufficient to lead a jury to conclude that Norman Hopkins received the murder weapon from defendant Donald Warren.

The majority opinion is long on the law (although misapplied) and short on the facts. For this reason, I set out a detailed factual statement based on the trial record before the jury. Before doing so, it would first be helpful to set out the basic criminal charge that the State was required to prove in this case.

The statute under which defendant is charged (referred to but not analyzed by the majority), section 45-7-207, MCA, requires, in the context of this case, that the State prove three essential facts. First, the State must prove that the defendant, Donald Warren, had knowledge of an impending investigation or proceeding. Second, the State must prove that defendant Donald Warren took action to conceal physical evidence (the pistol) pertinent to the investigation or proceeding. Third, the State must prove that defendant Donald Warren had the intent to purposely impair the availability of physical evidence (the .22 caliber pistol). The

-13-

State proved each of these facts. The testimony of Norman Hopkins was required only to show that it was the defendant, Donald Warren, who handed the pistol to Hopkins and asked him to dispose of it. Defendant's intent in doing so was not proved through Hopkins, for Hopkins did not know then that he had such intent. Rather, it was proved through other testimony by which the jury had every right to infer that defendant Donald Warren intended to dispose of an important item of evidence.

NORMAN HOPKINS--HIS RELATIONSHIP TO THE DONALD WARREN FAMILY, HIS FAMILIARITY WITH THE .22 CALIBER PISTOL AND ITS AMMUNITION CLIPS

Norman Hopkins and Kim Warren went together for almost a year, and during a good part of that time, they lived together. During this time, Hopkins also got to know the defendant, Don Warren, Ray Warren, defendant's son, and Joy Warren, defendant's wife. Other than Kim, he knew Don Warren better than any of the other family members. During this period of time, he saw Ray Warren perhaps on an average of once a month. During this time, however, Norman Hopkins became familiar with the .22 caliber pistol which later turned out to be the murder weapon.

On at least two occasions in February 1979, Norman Hopkins and Ray Warren went coyote hunting, and Ray Warren used the pistol involved. On one occasion, Norman Hopkins shot a coyote with it. On another occasion, they shot a fox and a coyote. On each of these occasions, there were two clips for the pistol. Norman Hopkins had one other occasion to see the pistol before it was turned over to him by Don Warren on August 15, 1979, to dispose of.

During June 1979, a truck driver's strike broke out in this state (as it did throughout the nation). Norman

Hopkins, a truck driver, who then had a route from Laurel, Montana, to St. Regis, Montana (a route which took about 26 hours round trip), was concerned about the violence and called up defendant Don Warren and asked him if he could borrow a gun to protect himself. He went over to Don Warren's house and Don Warren gave him the pistol involved here—a .22 caliber Stoeger-Luger semi-automatic. He gave him two clips for the pistol. Norman Hopkins had the pistol for about a week and then returned it to defendant Don Warren. This was the last time Norman Hopkins saw the pistol until Don Warren asked him to dispose of it on August 15, 1979.

## THE ARREST OF RAY WARREN ON MURDER CHARGES

Earl Ray Malcom was murdered close to midnight on August 14, 1979. Less than four hours later, Ray Warren and another person were arrested for the murder. A neighbor living next door to the victim, heard shots, ran out and obtained a good description of an individual running into a get-away car, and obtained a good description of the get-away car.

Steve Gillis, a neighbor sharing a common driveway with the murder victim (Earl Ray Malcom) was home watching television in the late evening of August 14 and early morning hours of August 15. He heard a rapid series of shots (later thought them to be .22 shots because of his own familiarity with using a .22 in target practice), and saw a man running toward a white Plymouth station wagon which had both left doors smashed in. He ran out to see what the shooting was about and heard glass falling out of the window of the get-away car. He was then only about ten to fifteen feet away from the get-away car. He called the police, gave a description

-15-

of the get-away car to them, and also a description of the person he saw running from the scene to get into the car. (Although the record is not entirely clear on this, it appears that it was based on this information that Ray Warren was arrested a little later in the morning on charges of homicide.)

It so happened that at the approximate time of the murder, deputy-sheriff Al Ketterling was visiting the home of defendant Don Warren. He had known the Don Warren family for about five years, and although on duty, was paying the family a social call. It was shortly before midnight on August 14. He was familiar with the Ray Warren vehicle. He noticed then that the Ray Warren vehicle was not parked at the home. After leaving the Warren home, he learned of the murder and obtained the description of the get-away car, a description fitting Ray Warren's Plymouth station wagon with all the body damage. Just a short time later (about 1:30 or 2:00 a.m.), he passed the Don Warren home and noticed that Ray Warren's car was parked in front. He called another deputy to get his opinion as to whether this was the get-away car, and then called the city police department to tell them the get-away car had possibly been found.

A short while later, Deputy Ketterling went to the Don Warren home with Captain Hensley of the Billings Police Department. Ketterling was not a part of the official investigation team and he went primarily as a friend of the Don Warren family to tell them about Ray Warren's possible involvement in the murder. Captain Charles Hensley was in charge of the murder investigation.

THE TESTIMONY OF CAPTAIN CHARLES HENSLEY

After the homicide had been reported, Captain Charles Hensley, a veteran then of almost 19 years on the Billings

-16-

police department, 13 years as a detective, took charge of the investigation and first went to the murder scene. Among other things, he saw empty .22 caliber shell casings scattered around the murder scene, he saw tire tracks, and broken glass scattered around the scene. Uniformed officers and two detectives were also investigating at the scene. By this time, the police had the description of the get-away car and of Ray Warren (given to them by Steven Gillis). Captain Hensley returned to the police station to see if the suspects had been located. On his arrival, he found that the suspects were in custody and the police were questioning them. He stayed at the police station for about 45 minutes and then drove to the Donald Warren home. He wanted to check out the Ray Warren car, which had by then reported back at the Donald Warren home. He also wanted to tell Donald Warren that they were looking for a .22 caliber weapon.

Deputy Ketterling went to the door, summoned Donald Warren, and then Captain Hensley explained to him that there had been a murder and that Ray Warren was a suspect and was in custody. He also explained that the police were looking for physical evidence relating to the homicide.

Captain Hensley specifically told Donald Warren that the victim had been killed with a .22 caliber gun, and that he was looking for a .22 caliber automatic pistol or any .22 caliber weapon. He also told Donald Warren that he wanted to check the Plymouth station wagon to see if it had been recently driven. Donald Warren replied that the only .22 weapon they had in the house was a rifle, but that Captain Hensley was welcome to take this gun and eliminate it by ballistic tests. Donald Warren also told Captain Hensley that he (Warren) had once been a police officer and he knew that Captain Hensley was just doing his job.

-17-

Captain Hensley also inspected the Plymouth station wagon parked by the Donald Warren home. He found the engine still warm, indicating that it had recently been driven. He also found that the left rear wheel or front wheel had driven through a mud muddle and there was a damp mark on the ground indicating the car had gone through and left a track on dry ground leading up to the vehicle. Although he did not go inside the car, he noticed, among other things, that there was broken glass in the car.

CONNECTION OF RAY WARREN TO A PISTOL ON AUGUST 14, 1979

Two young men, who knew Ray Warren quite well, saw Warren in his car on two occasions on August 14. The first time was about 7:30 p.m. and the second time was about 11:30 or 11:45 p.m., probably within 15 or 20 minutes of the murder. Both Robert Corey Nevins (age 19) and Leo Harshfield (age 17) saw Ray Warren parked at the Big Scoop ice cream parlor, just blocks away from the murder scene, and no more than 15 or 20 minutes before the murder. Ray warren drove his white Plymouth station wagon into the parking lot and parked it right next to the vehicle in which Nevins and Harshfield were parked. Both young men knew Ray Warren, and Nevins testified that he had known Warren for about two years.

Ray Warren and his passenger were sitting in the station wagon and Nevins and Harshfield went over to talk to them. Harshfield was on the passenger side of the station wagon just a few feet away from the car, and Nevins, was on the driver's side of the station wagon, just a few feet away from the car. Ray Warren was sitting in the driver's seat, the driver's door was open, and he had his legs sticking out. Both Nevins and Harshfield noticed that next to Ray Warren was a pistol, what appeared to them to be an automatic pistol.

-18-

These people talked for a while and then Nevins
and Harshfield left, Nevins taking Harshfield home.  Ray
Warren and his passenger were then still in the parking lot.
Fifteen or twenty minutes later, within blocks from the Big
Scoop ice cream parlor, Earl Ray Malcom  was murdered.

INVOLVEMENT OF NORMAN HOPKINS IN DISPOSING OF THE PISTOL
ON AUGUST 15, 1979

Norman Hopkins arrived home at about 6:30 a.m.  The
record does not disclose whether or not he had just completed
his round-trip truck route from Billings to St. Regis, Montana,
and back to Billings.  His girlfriend, Kim Warren was there.
She told him that her brother Ray Warren, had been arrested
for homicide.  The record is silent as to whether she told
him any more than this or whether she even knew more about
the arrest that this.  We must, therefore, assume that she
told him nothing else.

At approximately 3:30 p.m., Norman Hopkins and Kim
Warren drove to the Donald Warren home.  On their arrival,
Donald Warren mentioned that he was trying to raise bail so
he could get his son Ray Warren out of jail.  Shortly after
this bail discussion, Donald Warren told Norman Hopkins that
he had a .22 pistol he wanted Hopkins to dispose of.  He
told Hopkins that he had purchased the gun at Colstrip some
time ago, that it was unregistered, that he didn't know where
the gun had come from originally, and that he didn't want the
police to find the pistol in the house.

Donald Warren and Norman Hopkins went downstairs to
the basement, and Warren pulled the gun from inside a poof
pillow (a big fluffy pillow used as a chair) and handed it
to Hopkins.  (This was the same pistol that Norman Hopkins
and Ray Warren had used previously when they went coyote

-19-

hunting and the same one that Donald Warren had given to Hopkins to use during the truck driver's strike.) The pistol was in a holster and there was only one ammunition clip for the pistol.

Joy Warren, the wife of Donald Warren, then came in with a pair of levis in her hands to wrap the pistol in. Defendant Don Warren took the levis from his wife and went downstairs. Hopkins then laid the pistol in the levis, and wrapped it.

Donald Warren suggested to Hopkins that Hopkins should throw the pistol in the river when Hopkins drove his truck route to St. Regis, Montana, so that the pistol should disappear and never show up. Hopkins left almost immediately. Neither the defendant, Donald Warren, nor his wife, Joy Warren, nor his daughter, Kim Warren, testified to this transaction. Therefore, the only testimony as to this entire transaction is the testimony of Norman Hopkins. His testimony is uncontradicted and unimpeached. The jury clearly had a right to believe Norman Hopkins.

CONTACT OF NORMAN HOPKINS WITH THE DONALD WARREN FAMILY AFTER AUGUST 15 AND BEFORE HOPKINS TURNED THE PISTOL OVER TO THE COUNTY ATTORNEY

Hopkins kept possession of the pistol from the time he received it on August 15 until he turned it over to the county attorney's office on December 3, 1979. During this time, he talked to Donald Warren only once.

About two weeks after he received the pistol from Donald Warren (which would be the end of August or the first part of September), Hopkins telephoned Donald Warren at his home. Hopkins told Warren that he had disposed of the pistol

but he did not tell Warren what he did with it and Warren did not ask. However, Hopkins got the clear message from Donald Warren that something drastic would happen to him if the pistol should ever turn up.

About the middle of October 1979, Hopkins broke off his relationship with Kim Warren. The implication of the majority opinion is that Kim Warren broke off her relationship with Hopkins and that in retaliation Hopkins may have had the desire to frame Donald Warren for disposing of the pistol. There is not a scrap of evidence in the record to support this conclusion. Further, the uncontradicted testimony of Norman Hopkins is that he did not want to see Kim Warren any longer because he had met another woman and planned to marry her.

THE CIRCUMSTANCES OF NORMAN HOPKINS' TURNING THE PISTOL OVER TO THE COUNTY ATTORNEY'S OFFICE

The circumstances leading to Hopkins' turning the pistol over to the Yellowstone County Attorney's Office are revealing. As could be expected, Ray Warren was charged with the murder of Earl Ray Malcom, and his trial was set for mid-December 1979. The State was, however, proceeding to trial without the murder weapon. The record does not clearly reveal whether Hopkins knew by news reports that the murder weapon had not been recovered, but the implication is that he learned by the news reports that the murder weapon had not been recovered. So, in early December 1979, he telephoned the county attorney's office and asked what caliber gun was used in the murder. On learning the caliber, Hopkins made arrangements with the county attorney's office to turn the .22 caliber semi-automatic pistol over to the State.

Hopkins arranged to meet with members of the county attorney's staff at Mr. D's restaurant in Billings. Hopkins

arrived there with his attorney, and Howard Corbin (the prosecutor in this case) and Jeanne Wilson, from the county attorney's staff were present. They talked at the restaurant for about an hour and then Hopkins went to his car, retrieved the pistol, and turned it over to the county attorney's office. He also turned over a holster for the pistol and an ammunition clip for the pistol.

On learning that the murder weapon had been found, the defendant in the murder charge, Ray Warren, fled and still has not been apprehended.

Tests on the pistol showed that it was the weapon used in the murder of Earl Ray Malcom.

Based on Norman Hopkins' disclosures, Donald Warren was charged with tampering with evidence. At his trial on this charge, an F.B.I. agent, after Hopkins and a member of the county attorney's staff had identified the pistol, testified that the .22 caliber pistol was the murder weapon.

SUMMARY OF THE EVIDENCE

The pistol which Norman Hopkins turned over to the county attorney's office turned out to be the murder weapon. The evidence does not disclose how the pistol got from the murder scene back to Donald Warren's home, but somehow it got there. The chances are that Ray Warren brought it there. Ray Warren's car was identified as being at the murder scene, in fact, it was identified as the get-away car. Further, at the time of the murder, Al Ketterling was visiting the Donald Warren home and noticed that the Ray Warren car was not there. But an hour and a half later, after Ketterling had obtained a description of the get-away car, he noticed that Ray Warren's car was parked at the Donald Warren home. From this evidence, it is most reasonable for the jury to assume

-22-

that Ray Warren returned his car to the Donald Warren home, and it is most reasonable to also assume that he brought the murder weapon with him. But it is not necessary that Ray Warren personally brought the gun home. It is only necessary to determine that someone brought the gun to the Donald Warren home after the murder. The evidence would give the jury no problem in inferring this fact.

Further, Donald Warren knew that Ray Warren's car had been connected to the murder scene. For, by the time Captain Hensley and deputy Ketterling came to the Donald Warren home, Ray Warren had already been arrested for the homicide. Both Ketterling and Captain Hensley told Donald Warren this. Captain Hensley also told Donald Warren that he wanted to inspect Ray Warren's car, then parked at the house, and he also told Donald Warren that the police were looking for, as the murder weapon, a .22 caliber automatic pistol or any .22 caliber gun. Donald Warren replied that the only .22 gun there was, was a .22 caliber rifle and that the police were welcome to take it and conduct ballistic tests. This is the evidence of which Donald Warren had direct knowledge. On the other hand, not a scrap of evidence in the trial record shows that Norman Hopkins knew that Ray Warren's car had been connected to the murder scene or that the murder weapon was or at least was suspected to be a .22 caliber gun.

Assuming the juries believed Captain Hensley, and they had a right to do so, they could infer that Donald Warren lied when he told Captain Hensley that the only .22 caliber gun in the house was a rifle. Norman Hopkins testified to his own knowledge of the .22 caliber pistol involved: he used it when he and Ray Warren went coyote hunting on two occasions, and on both occasions, there were two ammunition clips for the pistol. Further, on another occasion

-23-

Hopkins talked directly to Donald Warren and asked to borrow a gun to take with him on his truck route to St. Regis. Donald Warren loaned him the .22 caliber pistol involved, and also gave him two ammunition clips. Based on this testimony, and his testimony that he received the pistol from Donald Warren on August 15 to dispose of because it was an unregistered pistol, the jury was entitled to believe that Donald Warren lied to Captain Hensley when he told him that only a .22 caliber rifle was in the house. Obviously, then, the jury could believe, and was entitled to believe, that Donald Warren did have knowledge that the .22 caliber pistol was in his home and that it was connected to the murder.

Two days after the murder, the Donald Warren home and automobiles were searched under the authority of a search warrant. No murder weapon was found. The police did find a .22 caliber rifle and they also found a .22 caliber ammunition clip with 11 live rounds in it, in Joy Warren's car. This ammunition clip did not fit the rifle, but it did fit the .22 caliber pistol later identified as the murder weapon. This ammunition clip corroborated Norman Hopkins' testimony that on all three occasions he had used the pistol there were two ammunition clips, but that when he received it from Donald Warren on August 15, there was only one ammunition clip. Further, the jury could also conclude by this testimony and evidence that Donald Warren had lied when he told Captain Hensley that the only .22 caliber gun around his home was a rifle.

The majority makes much of the fact that a murder weapon was not found when the house was searched (on August 17). That is not strange at all, however, since the State's theory of the case was, and the proof was, that Donald

-24-

Warren had disposed of the pistol on August 15 by asking Norman Hopkins to get rid of it. That was the very idea. Donald Warren, a former policeman, knew that the police would search for the murder weapon and he did not want it there. Although he did not tell Norman Hopkins that the pistol was connected to the murder, he did tell Hopkins that he wanted him to get rid of it because he did not want the police to find it. What is strange, then, about the police not finding the murder weapon during the search of the house?

We have, then, the uncontradicted testimony of Norman Hopkins telling the jury how he received the .22 caliber pistol and holster and ammunition clip from Donald Warren on August 15. He testified unequivocally that he did not know it was connected to a murder when he received it from Donald Warren. He testified unequivocally that he still did not know that the pistol was connected when he called the county attorney's office on December 3 to ask the caliber of the murder weapon. Norman Hopkins was not an accomplice because he did not have the same knowledge that Donald Warren had concerning the pistol or concerning the details of the police investigation connecting Ray Warren to the murder. The jury was entitled to believe his testimony.

Because of the Fifth Amendment privilege surrounding Donald Warren, the jury could not infer anything by Donald Warren's failure to testify. But the same is not true of the other members of his family present when Hopkins received the pistol from Donald Warren. Joy Warren, Donald Warren's wife, may have invoked the husband-wife privilege if the State called her to testify. But certainly the defendant Donald Warren could have called her if he felt she could help his cause. No privilege was involved with Kim Warren.

-25-

The prosecution sought to add her as a witness, but the defense resisted, and ultimately, the State dropped its request. But if the defense felt she could contradict Hopkins' version of what happened, nothing prevented the defense from calling Kim Warren as a witness.

Once Hopkins testified to the details of the conversations, the prosecution was entitled to proceed on the assumption that any additional testimony from either Joy Warren or Kim Warren would be cumulative. The State needed no corroboration because the very nature of Hopkins' testimony showed that he was not an accomplice. Therefore, if there were any discrepancies in his testimony, or if his testimony was a complete fabrication in the estimation of the defense, the defense had available as witnesses, Joy Warren, defendant's wife, and Kim Warren, defendant's daughter. The defense called neither. These witnesses were more available to the defense than they were to the prosecution, and the jury could infer that their testimony would not be helpful to the defendant, Donald Warren. Further, the jury could believe Norman Hopkins--after all, his testimony was uncontradicted and unimpeached.

The testimony of Norman Hopkins, in addition to the other evidence produced, was sufficient for the jury to convict Donald Warren of tampering with evidence. I see no trial errors that would dictate a new trial. Therefore, I would affirm the conviction.

Daniel J. Shea
                                        Justice

-26-