JUSTICE MORRISON,
dissenting:
I respectfully dissent.
The first problem with this case is that the defendant’s conviction was based upon accomplice testimony which was not sufficiently corroborated by independent evidence. The trial court should have directed a verdict in defendant’s behalf at the time of trial. I will quote extensively from the transcript to show that the state’s case failed.
The second part of the dissent will deal with the imposition of the death penalty. That discussion concerns aggravating circumstances versus mitigating circumstances and the conditions under which the death penalty may be imposed.
The defendant, Dewey Eugene Coleman, and Robert Nank met at the Veteran’s Hospital in Sheridan, Wyoming. Coleman was being treated for depression. Nank had a history of mental illness.
Coleman and Nank were discharged from the Veteran’s Hospital and came to Montana on Nank’s motorcycle. They “ran out of gas” between Roundup, Montana, and Forsyth, Montana, during the evening hours of July 4, 1974. Coleman testified that they unsuccessfully tried to hitchhike to the nearest town for the purpose of securing some gasoline. It began to get dark and Coleman stated that, since Coleman was black, he was impairing their ability to obtain a ride and Nank directed him to hide himself. Thereafter, according to Coleman, Nank was able to stop a vehicle and obtain a ride. Coleman testified that Nank left with the driver and headed in the direction of Forsyth. *443 Coleman said that Nank returned driving the car sometime later and that he was wet and emotionally upset. Nank instructed Coleman to remove their things from the motorcycle and come with him. Coleman obeyed. They drove, what was later determined to be the Harstad vehicle, past Forsyth in the direction of Rosebud. Nank stopped between Forsyth and Rosebud and pickup up something which appeared to be a blanket. He also stopped at a bar in Rosebud and obtained two Cokes. He advised Coleman that he had killed a woman. Nank headed back toward Forsyth and the Harstad vehicle “ran out of gas”. According to Coleman, Nank went into a field and hid something. Coleman was directed to carry a woman’s purse, which he did. Coleman looked at the purse, found no money and, pursuant to Nank’s directions, threw the purse into a culvert. The two walked to Forsyth, arriving there in the early morning hours. Nank obtained gasoline in a can and hitchhiked back to the motorcycle. Nank returned for Coleman and they left. Coleman stated that they eventually went to Boise, Idaho, where they rented and apartment and lived until the time of their arrest. Coleman stated that he did not report Nank to the authorities because he was afraid of Nank and because he was afraid of being implicated.
Nank’s testimony departs from Coleman’s at the point that the victim, Peggy Harstad, stopped to give Nank a ride. In contrast to Coleman’s testimony that Nank left alone with the young woman, Nank testified that Coleman went with him. He testified that Coleman was seated in the right front seat and he, Nank, was in the middle next to the driver. Nank stated that as they proceeded toward Forsyth he asked Peggy Harstad to stop the vehicle so that he could urinate. He stated that he and Coleman got out of the vehicle and urinated beside it. They then returned to the vehicle and headed towards Forsyth. As they approached Forsyth, Nank testified that he turned the ignition off and maneuvered the vehicle to the side of the road. Nank tied Peggy Harstad’s hands together with a yellow nylon rope. He removed her clothing except for her blouse. He attempted to have sexual intercourse with her but could not maintain an erection. He testified that Coleman then “got in the backseat” with Peggy Harstad and had sexual intercourse with her while Nank, now standing outside the car, held onto her foot.
Nank testified that he thereafter dressed the victim and they drove around deciding what to do. Eventually Nank stated that Coleman decided to kill Peggy Harstad. Nank then claimed that he threw the victim over his shoulder, with her hands still tied, and headed down *444 toward the Yellowstone River. He stated that Dewey Coleman hit her on top of the head continuously with a motorcycle helmet and that then Coleman attempted to strangle her with the yellow nylon rope. He stated that when this did not kill the victim that he, Nank, held her head under water in the Yellowstone River until she drowned.
Nank also related how he and Coleman went to Boise, Idaho, obtained an apartment and continued to live until the time of their arrest. Following their arrest, Nank and the defendant were interrogated by law enforcement officials in Boise, Idaho. Coleman maintained his innocence, but Nank confessed and agreed to testify against Coleman.
The testimony of an accomplice is viewed with suspicion because there is a strong motive for lying. In this case a number of law enforcement techniques were used to obtain a confession from Nank. A police officer admitted telling Nank, though it was not true, that he had witnessed a hanging and that it was gruesome. He further told Nank, though it was not true, that Coleman had confessed and blamed Nank for the murder. Nank thereafter exhibited a willingness to confess, but would only do so with some assurance that he would not hang. He was assured by law enforcement officials that they would make every effort to see that he would not hang and Nank thereafter gave a confession implicating Coleman.
Nank was charged with deliberate homicide, sexual intercourse without consent, and aggravated kidnapping. Only the latter offense carried the death penalty. Nank was permitted to plead guilty and receive noncapital sentences for deliberate homicide and rape. The aggravated kidnapping charge, which carried the death penalty, was held in abeyance until Nank testified against Coleman at the trial. After Coleman’s trial the aggravated kidnapping charge against Nank was dismissed.
It is obvious why an accomplice’s testimony must be viewed with distrust. Before a criminal charge against a defendant can survive a directed verdict and be submitted to a jury, there must be independent corroborating evidence implicating the defendant in the crime. That corroborating evidence “must raise more than a suspicion of the defendant’s involvement in, or opportunity to commit, the crime charged.” State v. Warren (1981), [192 Mont. 436,] 628 P.2d 292, 295, 38 St.Rep. 773, 776, (quoting from State v. Hemp (1979), [182 Mont. 383], 597 P.2d 96, 99, 36 St.Rep. 1215, 1218).
The following excerpt is taken from the first Coleman case, State v. Coleman (Decided April 26, 1978), 177 Mont. 1, 28, 579 P.2d 732:
*445 “In State v. Keckonen (1938), 107 Mont. 253, 84 P.2d 341, we held that where the alleged corroborative evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of the defendant, then such evidence does not tend to connect him with the commission of the offense and is in the realm of speculation, not corroboration. Where the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice. State v. Jones (1933), 95 Mont. 317, 26 P.2d 341.”
In applying the rule, the Supreme Court held, in the Coleman opinion cited above, that there was sufficient corroboration of Nank’s testimony to sustain the defendant’s conviction. The court found the corroborating evidence to be: A crack in defendant’s motorcycle helmet; a hair of Peggy Harstad found on the rope belonging to the two men; the fingerprints on Peggy Harstad’s car and in her purse; Negroid pubic hairs similar to defendant’s and Negroid head hair found in the victim’s vehicle; the evidence that the defendant and Nank were seen together on the same road at approximately the same time that Peggy Harstad disappeared. The court held that this evidence sufficiently connected the defendant to the commission of the offenses charged to allow the conviction to stand.
The evidence that defendant was on the road with Nank in the vicinity where Peggy Harstad disappeared does not corroborate the testimony of Nank anymore than it corroborates the testimony of Coleman. Coleman testified that he was with Nank on the evening in question. The same is true of Coleman’s fingerprints in the purse and in the vehicle. Coleman testified that he was in the Harstad vehicle after Nank returned with the vehicle. He testified that Nank told him to dispose of the purse. He testified that he first went through the purse and examined its contents. The existence of Coleman’s fingerprints on the purse’s contents and in the vehicle corroborate the testimony of the defendant as well as the testimony of Nank. Therefore, this evidence is “equally consonant with the reasonable explanation pointing toward the innocent conduct on the part of the defendant” as it is pointing toward guilt, and therefore, does not qualify as corroborating evidence.
If there is any corroborating evidence sufficient to take this case to the jury it must be found in the cracked motorcycle helmet or in rehable testimony that Coleman’s pubic hairs were found in the victim’s vehicle. A careful reading of the transcript shows that *446 sufficient corroboration did not exist.
There was a crack in Dewey Coleman’s silver colored motorcycle helmet. The prosecution contended that this corroborated Nank’s testimony that Coleman repeatedly struck Peggy Harstad on top of the head with the motorcycle helmet. There was no foundation to show that such a striking could or would crack a motorcycle helmet. There was no testimony to show that the helmet could be cracked in such a fashion without cracking the skull of the victim. This victim had no skull fracture at autopsy.
If the crack in the helmet had any corroborative significance, it was destroyed by the pathologist’s testimony. Dr. John Pfaff, board certified forensic pathologist, was called to testify by the State to prove that the decomposed remains which he examined at autopsy were those of Peggy Harstad. He did so. He was then questioned about his findings in connection with the tissue which covered the skull. He testified that if trauma occurred to the top of the head, he would expect to see bleeding into the tissue, but that he saw none. The following excerpts are taken from his testimony:
"... I could find no evidence of bony fracture in any of the skeletal remains that I examined. In the skull there was no brain tissue remaining. The fibrous lining membrane which covers the brain and separate from the skull bones was still intact. This is significant because in cases of skull fracture or serious injury to the skull, it may become detached and contain bleeding or blood extravasation. Such was not observed in this case.
“Question: And within that scalp tissue, did you find any evidence of an incised wound, a laceration or a hemorrhage?
“Answer: I did not.
“Question: Did you examine that dural lining to determine and ascertain whether there was any wound, laceration or hemorrhage?
“Answer: I did.
“Question: And what did you find?
“Answer: I found none.
“Question: Doctor, with respect to subdural hematoma, is it your testimony that it is possible to have a subdural hematoma without injury to the scalp, without injury or fracturing of the skull and without injury or hemorrhage to the subdural lining, is that possible?
“Answer: It’s possible, but there is usually injury to the scalp. There may be no injury to the bone, but if there is a blow struck to the *447 scalp there is usually evidence of that if the patient is living. (Emphasis added.)
“Question: All right. Now in this particular case did you find any evidence to substantiate injury to the head or to the face?
“Answer: In the tissue I examined, I found none.
“Question: Well, whatever you did in that autopsy examination, whatever was available to you, whatever procedure that you used, whatever scientific method that you employed, did you find any injury to the head or to the face?
“Answer: I did not.” (Trial Transcript Vol. Ill, pp. 572, 603, 605, 633.)
The only remaining evidence claimed for corroboration is that pubic hairs similar to Dewey Coleman’s were found in the Harstad vehicle.
The record reveals that hair samples were taken from the defendant and subjected to microscopic examination. Both head hair and pubic hair belonging to defendant were available for that examination. The victim’s car was vacuumed and numerous hair samples obtained from that vacuuming. These samples were also scrutinized microscopically and compared to the hair samples of defendant.
It should be remembered that defendant testified he was in the victim’s vehicle after Nank returned driving the vehicle. Therefore, the existence of defendant’s hair in the car corroborates defendant as well as Nank and does not provide independent corroborating evidence sufficient to sustain conviction. However, State places great reliance upon the fact that defendant’s pubic hair was allegedly found in the victim’s vehicle. The record does not support the State’s position.
In an effort to corroborate the State’s case, the prosecution called an expert witness to prove that the hair found in the victim’s vehicle was connected to the defendant. Before quoting excerpts from the expert’s testimony, it is important to take cognizance of the evidentiary rule here applicable. The offered testimony must be based upon a “reasonable degree of scientific probability” and is inadmissible if the testimony is based upon a mere “possibility’. Moen v. Decker Coal Co. (1980), [185 Mont. 79,] 604 P.2d 765, 36 St.Rep. 2220; Azure v. City of Billings (1979), [182 Mont. 234,] 596 P.2d 460, 36 St.Rep. 968; Farris v. Clark (1971), 158 Mont. 33, 487 P.2d 1307; Stordahl v. Rush Implement Company (1966), 148 Mont. 13, 417 P.2d 95.
The following excerpts are taken from the State’s expert witness:
*448 “Question: Did you make a comparison of the Q-2 hair that you have mentioned as having come from the automobile, and the K-2 as you have mentioned as coming from the head of Dewey Coleman?
“Answer: Yes, I did.
“Question: And what were your findings?
“Answer: I found that there some similarities between these hairs, but also there were some differences between those hairs.
“Question: As a result of that, what was your final conclusion?
“Answer: I reached no conclusion as to whether or not these hairs could have come from the same source.
“Question: ... Did you compare the pubic hairs, the known pubic hairs from Dewey Coleman with the Q-29 hairs that were removed from the debris from Peggy Harstad’s vehicle?
“Answer: Yes, I did.
“Question: And what were your findings?
“Answer: I found that the — the two black Negroid pubic hairs in the vacuumings from the vehicle, which microscopically match the hairs which were submitted to me as being from the pubic area of Mr. Coleman.
“Question: Will you explain that further please?
“Answer: Well, the fact that the hairs were microscopically alike allowed me to conclude that they could have come from the same source. The two pubic — the two black Negroid pubic hairs from the vacuumings of the victim’s vehicle could have come from the pubic area or Mr. Coleman.
“Question: You don’t say it does come from the same source, you say it’s possible that it could have come from that source, right?
“Answer: That’s correct.” (TrialTranscript Vol. VIII, pp. 1802,1805, 1806,1905,1906.) Emphasis added.)
Under well established law in Montana, this testimony was too speculative to be received in evidence, and once received, could not be relied upon as sufficiently corroborative to sustain a conviction.
This court’s decision in State v. Coleman, supra, wherein the court identified the corroborative evidence, also relied upon testimony that the victim’s hair was found embedded in the yellow nylon rope. Though the existence of such hair would only corroborate that the rope was used in killing the victim, and would not corroborate Nank’s testimony that Coleman was present, the evidence itself was insufficient. The same expert witness sought to relate hair found on the rope with the hair of the victim. He testified that there was brown *449 Caucasian hair embedded in the grayed ends of the rope. He again testified that the hair found in the rope could have been the hair of Peggy Harstad. Under the rule above enunciated such testimony could not be relied upon for corroboration. Additionally, this expert witness testified that he could not determine the sex of the person from whom the hair came. Nank also had brown Caucasian hair.
Interestingly, this same hair expert, testified that he had examined hair taken from the blanket later determined to be a blanket which Peggy Harstad had in her car when she left home. Brown Caucasian hair was found on the blanket. Nank had testified that he and Coleman were on the blanket smoking cigarettes after they had killed Peggy Harstad. Coleman testified that he knew nothing about the blanket and had had no physical contact with it. The examination revealed no Negroid hair upon the blanket.
There simply was no corroboration sufficient to lend credence to the testimony of Nank. The trial court realized this. At the time the prosecution rested, and the defense moved for a directed verdict, the trial court indicated that there was no corroboration but stated he would allow the Supreme Court to rule on the question.
After the defense made a motion for directed verdict because there was not sufficient corroboration for an accomplice’s testimony, the prosecution resisted and the following discussion was held:
“THE COURT: Well, I treat this as a serious motion.
“MR. OVERFELT: In what regard?
“THE COURT: Well, I am not going to grant the motion, but I say it has some merit.
“MR. OVERFELT: I frankly don’t think it has any. We could have gotten to the jury on circumstantial evidence alone, Your Honor, and I’m confident of that.
“THE COURT: Well, all you have shown is the opportunity for this black boy to do it. You have shown plenty of opportunity.” (Trial Transcript Vol. EX, pp. 2106-2107.)
As previously noted, corroborative testimony showing only opportunity is insufficient to allow the case to go to jury. Though the trial court found, as I have found, that there is no corroboration, he nevertheless allowed the case to go to the jury so that the Supreme Court would have an opportunity to review the complete record and make a determination.
I am greatly bothered by this case. The only evidence that the defendant is guilty of the crimes charged comes from an accomplice who was a self-proclaimed liar and who had every reason to peijure *450 himself. This accomplice, though he had a history of violence and sexual deviation, was given a noncapital sentence. The defendant, whose guilt was not proven by competent evidence, had no previous felony record and yet was sentenced to death.
The death sentence in Montana is governed by three statutes which are hereinafter quoted in their entirety:
“Aggravating Circumstances. Aggravating circumstances are any of the following:
“(1) the offense was deliberate homicide and was committed by a person serving sentence of imprisonment in the state prison.
“(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.
“(3) The offense was deliberate homicide and was committed by means of torture.
“(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.
“(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.
“(6) The offense was deliberate homicide as defined in subsection (l)(a) of 45-5-102, and the victim was a peace officer killed while performing his duty.
“(7) The offense was aggravated kidnapping which resulted in the death of the victim.” (Section 46-18-304, MCA.)
“Mitigating circumstances. Mitigating circumstances are any of the following:
“(1) The defendant has no significant history of prior criminal activity.
“(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
“(3) The defendant acted under extreme duress or under substantial domination of another person.
“(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
“(5) The victim was a participant in the defendant’s conduct or consented to the act.
“(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.
*451 “(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.
“(8) Any other fact exists in mitigation of the penalty.” (Section 46-18-304, MCA.)
“Effect of aggravating and mitigating circumstances. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 46-18-303 and 46-18-304 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 46-18-303 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.” (Section 46-18-305, MCA.)
Under the above quoted statutes the death penalty is imposed if there is an aggravating circumstance and mitigating circumstances do not call for leniency. The first six subsections of section 46-18-303, MCA, are inapplicable to this defendant. The only aggravating circumstance to be found under the statute, if indeed one existed, would be rooted in subsection (7). There is absolutely no corroborating evidence to show that this defendant was involved in aggravated kidnapping resulting in the death of the victim. Even if one were to accept the “hair testimony” offered by the expert, it would only corroborate that defendant committed the act of sexual intercourse. This act could not have resulted in the death of the victim. There is no testimony corroborating Nank’s testimony that the defendant participated in an act which resulted in the death of the victim.
A very strong mitigating circumstance exists under 46-18-304, MCA. The defendant has no felony record. Furthermore, under subsection (8), of the statute, any fact existing in mitigation, must be considered by the court. The questionable guilt of the defendant is certainly such a mitigating factor.
We have seen that there is no corroborative testimony to support Nank’s version of this matter. I would like to examine Nank’s testimony itself to show the total unreliability of that testimony. The purpose of such examination is to show the weakness of the State’s case, the likelihood that the defendant is innocent, and the fact that the death penalty should never be imposed in such a circumstance.
Though the jury convicted Coleman, the trial judge should consider the certainty of Coleman’s guilt before imposing the death penalty. *452 There was no confession from the defendant. There were no disinterested witnesses directly connecting Coleman to the commission of the offenses charged. As previously discussed, there was no independent corroborating evidence of any kind. If Nank’s testimony lacked credibility, the evidence of Coleman’s involvement becomes even more speculative. The following excerpts from the record bear upon Nank’s veracity:
“Answer: She drove the pickup through the driveway and over down within maybe five feet of the bike. I then tipped the motorcycle right side up and I proceeded to fill the gas tank up. I lied to her. This is going back to the crime and I was always trying to make up stories. You know.
“Question: Did you tell them the same thing that you have told the jury here in the last two days?
“Answer: No, I lied to Mr. Brake.
“Question: In what respect did you lie to Mr. Brake?
“Answer: I bed. I Told Mr. Brake that Dewey tied Peggy Harstad up and I told him that Dewey undressed her instead of me.
“Question: So that any statement in any record that you took LSD 25 or 30 times would be a lie?
“It was in a lie in so much that maybe at that time I was going to try to use that as an excuse to be admitted for my crime into a state hospital instead of going to prison, and so that is maybe the reason that I made that statement, and I did lie because I heard of cases like this before, so I may have lied, yes.
“Question: So now you did tell somebody that you had used LSD 25 or 30 times, but even though you lied about it, you thought you might be able to get off or get into a state hospital or something, is that right?
“That would be the purpose of it, yes.
“Question: Well, did you give them any examples of aggressive behavior on your part?
“Answer: I don’t know, I did a lot of lying so I cannot state nothing truthfully about what I said there and get a correct answer...” (Trial Transcript Vol. V, pp. 1056, 1057, 1102, 1103, 1130.).
Nank’s testimony on the stand was also contrary to the testimony of law enforcement officers. Nank testified that he was telling the truth and the law enforcement officers were lying. One of the law *453 enforcement officers who originally interrogated Nank following his arrest in Boise, Idaho, stated that Nank told him he became upset with Peggy Harstad because she had said something to hurt his ego. Nank, during the Coleman trial, accused the law enforcement officer of lying about this matter. The following excerpt is taken from the transcript:
“Question: And do you recall that he said T bet you that she probably said something to you that either hurt your ego, made you very mad, extremely upset’, or something like that, and did you drop your head and not make any comment to that question?
“Answer: I did not make any comment because I knew that he was trying to make me make some kind of a statement.
“Question: And then he said, ‘Did she say something to infuriate you or hurt your ego’, or this type of thing, and you said, Yes, Yes, she did.’
“Answer: No, I never did say that. Mr. Brake lied and I also told Judge Martin when I was in an earlier court hearing before about that.
“Question: Mr. Brake lied?
“Answer: Mr. Brake did he.” (Trial Transcript Vol. V, pp. 1091, 1092.)
Law enforcement officer Brake had also testified that at the time Nank and Coleman were arrested in their apartment in Boise, that Nank told the police to “Get your ass out of here.” Nank, during the Coleman trial, again accused the law enforcement officers of lying. The following excerpt is taken from the record.
“Question: And did you when you were arrested tell the Boise police to ‘Get your ass out of here’?
“Answer: No. Mr. Brake lied about that, and I also tried to explain that to Judge Martin in an earlier court hearing that I said that Mr. Brake lied. That’s one thing, I have never —■ I have never called a policeman a name. He lied about that, too.” (Trial Transcript Vol. V, p. 1227.)
Again, Officer Brake testified that he read the constitutional rights to Nank at the time of his arrest. Nank, while testifying during the Coleman case, disputed this. Nank testified:
“Question: Did he verbally — did Mr. Brake verbally advise you of your rights as soon as you were placed under arrest?
“Answer: Not at that time. Not at that particular time, no.
“Question: You heard Mr. Brake say that he did advise you of your rights, and that’s a lie according to you?
*454 “Answer: He did not at that time when we were arrested verbally advise us of our rights at that time, no, he did not.
“Question: You heard him testify that he did?
“Answer: He did not do it.
“Question: Well then, he lied?
“Answer: He lied.” (Trial Transcript Vol. V, p. 1227.)
Nank’s testimony itself was riddled with inconsistency. Though the record is replete with examples, the following is illustrative. When testifying about who undressed the victim, Nank gave the following testimony:
“Question: You took her shoes off didn’t you?
“Answer: Yes, I did.
“Question: You undressed her?
“Answer: Dewey did.” (Trial Transcript Vol. V, p. 1189.)
The following testimony is taken from page 1210, Vol. V, of the trial transcript.
“Question: And did you undress her?
“Answer: Yes I did.
“Question: And did you dress her up again?
“Answer: Yes I did.”
And from page 1223 and 1224, Vol. V, of the trial transcripts, the following testimony is taken:
“Question: Do I understand that Dewey never took her clothes off?
“Answer: Dewey did not take her clothes off.
“Question: Do I understand that you took her clothes off?
“Answer: I did take her clothes off.
“Question: And that included her pants?
“Answer: She had on — well, some kind of moreless trousers or whatever.
“Question: Did that include underpants?
“Answer: I do not remember if she was wearing underwear at that time or not.
“Question: Did you put her clothes back on?
“Answer: I put her blue jeans back on. I think with what she was wearing, I put them back on, yes.
“Question: So that you were the only one that dressed or -undressed her, is that correct?
“Answer: Yes, that’s correct.
In the first statement Nank gave to law enforcement officials he said Coleman undressed the victim. On the stand Nank testified that Coleman undressed the victim and then changed the testimony and *455 testified that he was the only one who had undressed the victim. His testimony, to say the least, was incredible.
Nank had a history of violence beginning with his childhood. Though the records show that he attacked his mother with a butcher knife, he testified that it was his mother who attacked him with the knife. Nank related the following testimony during the course of Coleman’s trial:
“Question: Now you stated that your mother, Mrs. Nank — Mary, was that her first name?
“Answer: Margaret.
“Question: Margaret. At one time when you were 18 years of age, held a butcher knife at your throat and chased you around the house with a poker beating you upon the head and shoulders and then tearing the front of her dress and going out in the street and telling other people that you had attacked her sexually; did you do that?
“Answer: No, you stated that wrong, sir.
“Question: Well, did she hold a butcher knife at your throat?
“Answer: Yes, she did.
“Question: And did she chase you around the house with a poker?
“Answer: Yes, she did.
“Question: Did she hit you about the head and shoulders with a poker?
“Answer: Yes, she did.
“Question: Did she tear the front of her dress?
“Answer: The front of her blouse.
“Question: And did she tell other people that you had attacked her sexually?
“Answer: No, she did not.
“Question: She did not?
“Answer: She did not run out in the street and holler at people, no, she did not.
“Question: Did she tell other people that you had attacked her sexually?
“Answer: I think she might have told a doctor. I do not know.” (Trial Transcript Vol. V, pp. 1074, 1075.)
Though the records show that Nank had attacked his mother with a butcher knife and indicate that he may have attacked her sexually, he took the witness stand in the Coleman case and said that his mother in fact had been the aggressor and he the victim.
Nank had been institutionalized in mental hospitals on four previous occasions. He had a history of violence including violence *456 against both his mother and his sister. He had a felony record.
On the other hand, Coleman had no history of violence and no felony record. Coleman was a homosexual.
A psychologist testified with respect to a rapist’s typical characteristics. This testimony showed that Nank fit the pattern but Coleman did not. In fact, this witness testified that the incidents of homosexuals being involved in rape was “practically zero”.
In my nineteen years at the bench and bar I have seldom been so deeply disturbed by the injustice of a result. A defendant is here sentenced to die where there is practically no credible evidence connecting the defendant to the commission of the crime. There are strong reasons to believe the defendant did not commit the crime for which the death penalty was imposed. And yet this court is authorizing the imposition of that irrevocable sanction. I implore the federal courts to examine this record, and upon finding it to be as wanting as I do, to intervene and prevent this gross injustice.